## CITY OF TEXARKANA *v.* ARKANSAS LOUISIANA GAS CO.

No. 294.  Argued January 4, 5, 1939.—Decided February 6, 1939.

[REDACTED]

*Mr. Benjamin E. Carter,* with whom *Mr. Ed B. Levee, Jr.* was on the brief, for petitioner.

*Messrs. William C. Fitzhugh* and *Henry C. Walker, Jr.,* with whom *Mr. William H. Arnold, Jr.* was on the brief, for respondent.

MR. JUSTICE REED delivered the opinion of the Court.

A writ of certiorari brings to this Court for review a judgment[1] of the Circuit Court of Appeals for the Fifth Circuit denying the validity or applicability of the following section in a franchise granted to respondent by petitioner in 1930. Section IX of that franchise reads as follows:

"If Grantee shall be finally compelled to, or should voluntarily, place [sic] in any rates in the City of Texarkana, Arkansas, less than the rates granted by this Ordinance then and thereupon the lessened rate shall apply in the City of Texarkana, Texas, and Grantee shall not be authorized or permitted to charge and collect any higher rate."

Texarkana, Texas, and Texarkana, Arkansas, are adjacent cities divided by the Arkansas-Texas state line. Respondent serves as a public utility for the distribution of gas in

---

[1] *Arkansas Louisiana Gas Co.* v. *Texarkana,* 97 F. 2d 5.

both cities. Because of the section just quoted, the Texas city undertook judicial action to secure gas for itself and its citizens at rates lower than those stated in other sections of the franchise. We granted certiorari [2] on account of asserted conflict with the decisions of the state courts on an important question of local law.

The charter of the Texas city gives authority to grant franchises for the use of its public ways upon terms to be embodied in ordinances, which must expressly provide that the city shall retain the regulation of the business of the utility, the fixing of its rates and the right to inspect its operations. Should these reservations be omitted, they are nevertheless to be considered part and parcel of the franchise.[3] The charter also provides that the city shall have the power to regulate rates charged by gas com-

---

[2] 305 U. S. 584.

[3] Sec. 160. "The rights of the City of Texarkana in the use of the public streets, alleys, squares, parks, bridges and all public places are hereby declared to be inalienable to any person, firm or corporation, except by license permit and franchise passed by the city council on the affirmative vote of three-fifths of all the members of said council elected."

Sec. 163. "Said proposed franchise shall contain all the terms and agreements between the parties thereto, and it must expressly set forth that the council shall have the right and privilege of regulating and controlling the operation of all business done thereunder, fixing fares, rates, tolls and charges and inspecting the business and work from time to time as it progresses, and rate regulations shall conform to Section 197 of this charter."

Sec. 163a. "In the event that any franchise or permit is so given by said council, which shall not contain such stipulations therein as provided for in Section 162 of this charter, then it shall, nevertheless, be considered that all of the said stipulations contained in said Sections 162, 163 and 197 are part and parcel of the said contract and franchise, just as though written therein, and the said applicant so accepting such franchise, as well as their heirs, assigns and successors, shall be held and firmly bound thereto, notwithstanding such omissions."

panies.[4] The gas company and its predecessors had long held a franchise for furnishing gas to the Texas city. The earliest ordinances of the city were amended in 1923, by which amendment certain rates for gas were fixed. Article E in that ordinance provided that the gas company should "not at any time charge for furnishing gas" to the Texas city "a greater sum . . . than it at the same time charges and collects" from the Arkansas city. On June 17, 1930, the gas company accepted a compromise agreement, in ordinance form, which increased the rates to gas consumers from those set out in the 1923 franchise. This is the ordinance containing the § IX heretofore quoted and it is the ordinance regulating rates now in effect in the Texas city.

On May 30, 1930, the gas company secured a similar arrangement adjusting rates from the Arkansas city. There had previously been in effect a franchise of 1923 with rates substantially identical with the Texas 1923 rates. The Arkansas franchise of 1930 was subjected to a referendum and to prolonged litigation. Eventually, on December 1, 1933, a final order set aside the 1930 ordinance of the Arkansas city and established the rates of the 1923 ordinance as effective for the consumers of the Arkansas city from 1930 to the date of the decree. This

---

[4] Sec. 196. "That the city council shall have the power to regulate by ordinance the rates and compensation to be charged by all water, gas, light and telephone companies, corporations or persons using the streets and public grounds of said city and engaged in furnishing water, gas, light and telephone service to the public, and to prescribe reasonable rules and regulations under which such commodities shall be furnished and services rendered, and to fix penalties to enforce such charges, rules and regulations; provided, that the city council shall not prescribe any rate or compensation which will yield less than ten per cent per annum net on the actual costs of the physical properties, equipments and betterments. Said city council may also fix the charges which may be collected for transporting passengers and baggage in vehicles engaged in public service."

decree also required refunds to the Arkansas consumers for overpayment during that period.[5]  By further litigation, a resolution of the council of the Arkansas city of December 22, 1933, promulgating rates for the future was upheld.[6]  These last rates were the 1923 rates, modified in minor particulars.  In the order of December 4, 1936, confirming the rates established by its resolution, the gas company was directed to refund to the consumers any overpayment by reason of the collection of higher rates during this last judicial proceeding.  It thus appears that the legal rates to the consumers of the Arkansas city at all times have been substantially those of the 1923 ordinance.

In Texarkana, Texas, the consumers have paid since 1930 the rates fixed in that ordinance, which are substantially higher than those finally determined as applicable to the Arkansas consumers.  The gas company in October, 1933, sought from the Texas city council rates still higher than those granted by the 1930 ordinance.  The company gave notice that on November 23, 1933, a new and higher schedule of rates than those provided in the 1930 agreement would be established in the Texas city.  The Texas city sought and obtained in the state court an injunction against this increase.  This is still effective.  This suit was removed to the federal district court for Texas.  The bill was amended on January 15, 1934, to set up an additional cause of action against the gas company by reason of the entry of the decree on December 1, 1933, in the Arkansas litigation.  As this decree was a final order determining that the Arkansas consum-

---

[5] *Arkansas Louisiana Gas Co.* v. *Texarkana*, 97 F. 2d 5, 6, col. 2; cf. *Southern Cities Distributing Co.* v. *Carter*, 184 Ark. 4; 41 S. W. 2d 1085, appeal dismissed 285 U. S. 525, 526; *Texarkana* v. *Southern Cities Distributing Co.*, 64 F. 2d 944, cert. denied 290 U. S. 650.

[6] *Arkansas Louisiana Gas Co.* v. *Texarkana*, 17 F. Supp. 447; affirmed 96 F. 2d 179; cert. denied, 305 U. S. 606.

ers should pay only the 1923 rates, the Texas city con-
ceived its citizens should have the benefit of the same
lower rates by virtue of § IX.   It was further sought by
this amendment to recover for the affected time a refund
for the Texas consumers equal to the difference between
the Arkansas rates, as determined by the decree of De-
cember 1, 1933, and the Texas 1930 rates.   Later, on
December 30, 1936, a supplemental bill was filed to set
out the further claim of the Texas city consumers, for the
period between that covered by the first amendment and
the filing of the supplemental bill, together with a prayer
that the gas company be compelled to pay into the regis-
try of the court the excess amount which it was alleged
it had and was continuously collecting from the Texas
consumers.   Immediate distribution was asked for the
funds applicable to those periods concerning which no
further Arkansas litigation was pending.

The situation from the standpoint of the Texas city
might be summarized by saying that it seeks for its con-
sumers the lower 1923 Arkansas rates instead of the Texas
1930 rates, from the effective date of the Arkansas resolu-
tion of May 30, 1930, to February 16, 1934.   This re-
fund is claimed because the Arkansas consumers obtained
these lower rates by the Arkansas decree of December 1,
1933, and the voluntary act of the gas company in collect-
ing the lower rates from the date of the decree to Febru-
ary 16, 1934.   On final affirmance of the Arkansas litiga-
tion, it seeks refunds for its consumers from February 16,
1934, to December 4, 1936, of the difference between the
Texas 1930 rates and the Arkansas December 22, 1933,
rates.   This refund is claimed because of the decree of
December 4, 1936,[7] validating for the Arkansas consumers
the rates of the 1933 resolution.   These rates were sub-

---

[7] United States District Court, Arkansas: *Arkansas Louisiana Gas
Co.* v. *Texarkana,* Cause No. 219.

stantially the same as those fixed in the 1923 ordinance. As an injunction, pending appeal, was refused, these lower rates have been in effect in Arkansas since the date of the decree. As pointed out above, the decree was affirmed by the Circuit Court of Appeals and certiorari refused here. It is further sought to have put into effect in Texas the rates collected in Arkansas after December 4, 1936. The right to the lower rates and to the refund depends upon the interpretation of § IX.

Another bill was filed by the Texas city in May, 1934, seeking substantially the same relief as that sought in the proceeding heretofore detailed. The reasons for the filing of this second suit and its purpose are not material to the present proceeding. The two actions were consolidated. Later motions, pleadings and the decree in the two cases are the same.

The gas company filed answers to the bills set out above and a counterclaim seeking higher rates. Section IX was challenged as invalid because of conflict with the provisions of the city charter, the laws and constitution of Texas. It was asserted that the section was not a binding contract on either party to the franchise and further asserted that if § IX was valid, it was inapplicable to any of the three periods for which the Texas city sought relief and refund. The district court granted the city's motion to strike the answers and counterclaim and, the gas company declining to amend, decreed that § IX was a binding contract between the parties; that it was inapplicable to the period prior to December 1, 1933; that refund should be made from December 1, 1933, to February 16, 1934; and that the suit was premature as to the period after February 16, 1934, because an appeal was pending in the Circuit Court of Appeals for the Eighth Circuit at the time the second amendment was filed by the Texas city on December 30, 1936. The Circuit Court of Appeals reversed and remanded with directions to dismiss

the bill.[8] It thought that § IX was an invalid abdication or delegation of the Texas city's rate-making power since the section purported to bind both parties to lower rates which might be fixed by the gas company and the Arkansas city. The lower court stated also, without discussion, that the clause was inapplicable even if valid. The petition for certiorari relies upon the alleged error of the lower court in deciding that the section was invalid and inapplicable.

*Abdication or delegation of regulatory power.* By the act to incorporate the city of Texarkana, Texas, the legislature granted a special charter which contained delegations of power to the municipality to contract for utilities and to regulate gas rates, and prohibitions against the granting of a franchise without specific reservation of this power of future regulation.[9] The respondent takes the position that since § IX not only requires the application of lower Arkansas rates to Texas consumers but provides that the gas company "shall not be authorized or permitted to charge and collect any higher rate," the Texas city has abdicated power to raise the Texas rates above the Arkansas rates. As the Texas city is forbidden to give up the power to regulate rates, the section, says the company, is invalid.

The city agrees that any delegation or abdication of complete power to regulate rates would be unlawful and any provision of a franchise leading to that result invalid under the decisions of Texas.[10] It is the petitioner's po-

---

[8] *Arkansas Louisiana Gas Co.* v. *Texarkana,* 97 F. 2d 5.

[9] The provisions are set out in notes 3 and 4, *supra.*

[10] *Uvalde* v. *Uvalde Electric & Ice Co.,* 250 S. W. 140; *Texas Gas Utilities Co.* v. *Uvalde,* 77 S. W. 2d 750; *Nairn* v. *Bean* (Com. 1932), 48 S. W. 2d 584, 586; cf. *Railroad Comm'n* v. *Weld & Neville,* 96 Texas 394, 405; 73 S. W. 529; *Missouri-Kansas & T. R. Co.* v. *Railroad Comm'n,* 3 S. W. 2d 489, 493; *Green* v. *San Antonio Water Supply Co.* (Civ. App.), 193 S. W. 453.

sition, however, that a proper interpretation of the section leaves with the city the unimpaired power to regulate the gas rates, within the limits of the applicable constitutional provisions. We agree with this analysis of the section. The words just quoted prohibiting the charge or collection of higher rates more reasonably imply a limitation on the right of the gas company to look to other provisions of the franchise for authority to exact other rates. But if this view is not accepted, it is quite clear tnat the charter provision 163a retaining the right to regulate must be read into the franchise. This would result in leaving in the council of the Texas city the power to raise or lower the gas rates.

Nor, in this view, can it be said there is delegation as distinct from abdication of the power to regulate. It is true, extra-state action determines that the rate shall lessen, but the council has power over the rates at all times. The Arkansas rate is a mere measuring rod, as though the rate fluctuated with temperature or consumption. Even if § VIII-A[11] is valid, in the face of §§ 163, 163a and 196 of the charter, it is inapplicable, by its terms, to the power of the city to increase rates.

*The obligation of the utility under section IX.* As the lower court determined § IX is wholly invalid as a delegation and abdication by the city of its rate making powers, there was no occasion for it to consider whether the

---

[11] Section VIII-A. "In consideration of the granting of this franchise, it is mutually agreed and understood by and between the parties hereto that before the City Council of said City shall apply for a reduction in rates, or before the Southern Cities Distributing Company, its successors or assigns, shall make application for an increase in rates, either party shall give to the other party one year's notice in writing of its intention to so apply for an increase or decrease in rates, and no application for increase or decrease in rates shall be acted upon or considered unless said one year's notice is first given before making such application."

section was binding upon the utility alone. With the conclusion that the city is free to raise or lower the rate, in the public interest, we must inquire whether the gas company is bound to furnish Texas consumers their gas at the lessened Arkansas rates. The determination follows the state law.[12] This court looks to the trial court for the original examination of local questions [13] and relies for aid upon the explanation of its conclusion. While no opinion was written in the trial court, its decree found § IX a "binding contract" and awarded recovery for a portion of the time involved. Assuming the district court agreed with this Court that the city could not and did not delegate or abdicate its rate making function, this necessarily required a holding that the company alone was bound by this section of the contract. An appeal, with specific assignment of this ruling as error, brought the case to the Circuit Court of Appeals and the point is argued here by respondent as justification for the judgment reversing the District Court.[14] Under these circumstances, we feel constrained to pass upon the question.[15]

It cannot be said that any opinion of the Supreme Court of Texas settles the problem of whether a utility is bound to a contract for a schedule of rates when the municipality is not. That court, in 1925, in *Dallas Railway Co.* v. *Geller,* did state that an ordinance on rates is a contract.[16] There had been a franchise with a fixed

[12] § 34, Act of September 24, 1789, c. 20, 1 Stat. 73, 92, 28 U. S. C. 725; *Erie R. Co.* v. *Tompkins,* 304 U. S. 64; *Southern Iowa Electric Co.* v. *Chariton,* 255 U. S. 539, 543; *Railroad Comm'n* v. *Los Angeles Ry. Corp.,* 280 U. S. 145, 151.

[13] *Railroad Comm'n* v. *Los Angeles Ry. Corp.,* 280 U. S. 145, p. 164 dissent, n. 1.

[14] *Langnes* v. *Green,* 282 U. S. 531, 538.

[15] Cf. *Ruhlin* v. *New York Life Ins. Co.,* 304 U. S. 202, 206.

[16] 114 Texas 484; 271 S. W. 1106.

maximum rate. The municipality granted an increase. A citizen objected on the ground that the franchise, as a contract, bound the municipality and the utility to the agreed rate. The Court of Civil Appeals[17] held the rate section of the franchise was not a "fixed contract" but a rate schedule, subject to the city's power of regulation by reason of § 17 of Article 1 of the Texas Constitution forbidding uncontrollable grants of special privileges. On review, the Supreme Court stated that a question had been raised by city attorneys, appearing as *amici curiae*, as to the meaning of the language of the lower court which was construed by some to hold that "a municipality cannot make contracts that are binding upon public service corporations."[18] While the court could have avoided comment on the point upon the theory that whether or not there was a contract, the city's regulatory power was unaffected, it chose to interpret the franchise in the light of the contract in these words: "The right or power to further control or regulate the grant in regard to the rate schedule is a reservation to the municipality and not an inhibition to contract; and where a franchise is accepted by a grantee, this reservation . . . becomes a part of the contract." Later the Supreme Court, in discussing the power of the legislature to authorize specifically binding rate contracts for definite periods, citing the *Uvalde* case, said, "It is well established in this state that the Legislature . . . may authorize municipal corporations to enter into contracts" for rates for limited periods.[19] We reason from these opinions that in Texas a

[17] *Geller* v. *Dallas Ry. Co.*, 245 S. W. 254, 256.

[18] It was stated in petitioner's brief and not denied that after the decision in *Uvalde* v. *Uvalde Elec. & Ice Co.*, 250 S. W. 140, discussed in the next paragraph, briefs were filed in the Supreme Court in the *Geller* case arguing the effect of the *Uvalde* decision.

[19] *Lower Colorado River Authority* v. *McGraw*, 83 S. W. 2d 629, 638; 125 Texas 268.

utility franchise is a contract, with an express or implied provision that the rate schedules are subject to regulation by the city. In such a contract an agreement by the utility to lower rates under specified conditions is binding, although the rule as to the reserved power of regulation prevents the city from agreeing not to raise or lower rates. Grant of the franchise is consideration for the undertaking of the utility to maintain the prescribed rates until they are altered by the exercise of the reserved power of the municipality to regulate rates.

The case of *Uvalde* v. *Uvalde Electric & Ice Co.,* 1923,[20] is suggested as an authority against interpreting a rate contract, invalid as to the city, as binding upon the utility. Uvalde, without power to contract for rates, did so contract. The utility raised the rates without permission. The court was of the view that "the power to regulate rates and the power to stipulate by contract for a term of 10 years for rates cannot coexist." Looking at the contract in this way and without discussion of the effect of the attempted agreement on the utility, an injunction against the new rates was refused. That case appears rather a precedent for the rule that where a city is not authorized to contract as to rates but only to regulate them, any effort to contract is nugatory. As indicated above, it has been cited by the Supreme Court of Texas as authority for the right of a municipality to contract when so empowered.

This Court has had other occasions to consider the rights of Texas utilities under the provisions of the Texas statutes and constitution. In *San Antonio Traction Co.* v. *Altgelt* [21] we assumed a rate contract between the city and the street railway, and ruled that it was subject to

---

[20] 250 S. W. 140. Compare *Texas Gas Utilities Co.* v. *Uvalde,* 77 S. W. 2d 750, 752.

[21] 200 U. S. 304, 308.

§ 17 of the Texas bill of rights,[22] which declared that all privileges granted by the legislature remained under its control. Consequently, an enactment changing the rate agreement was valid. Later, 1920, in *San Antonio* v. *San Antonio Public Service Co.*[23] in passing upon a rate increase by a utility in the face of a franchise limitation we ruled that § 17 of the constitution, with its provision against irrevocable special privileges, made impossible a contract in Texas on rates because of the conflict between the right to contract and the superior and inconsistent power to regulate. To the argument that the company might be bound, though the city was not, the court replied: If the city is not bound "it would follow that that power [uncontrolled regulatory] would be required to be exerted and hence the supposed condition operating upon the private owner would be nugatory." [24]

These conclusions of this Court are inapplicable here for two reasons: first, the subsequent opinion of the Supreme Court of Texas in the *Geller* case indicates that regulatory and contract power may be exercised concurrently in that state; second, the charter of Texarkana, Texas, gives it specific power to enter into franchise agreements with rate regulation reserved to the city.[25] The

---

[22] Constitution of State of Texas, Bill of Rights, Vernon's Texas Statutes 1936, Art. I, p. XXV, § 17. "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities, shall be made; but all privileges and franchises granted by the Legislature, or created under its authority shall be subject to the control thereof."

[23] 255 U. S. 547, 555, 556.

[24] Cf. *Railroad Comm'n* v. *Los Angeles Ry. Corp.*, 280 U. S. 145, 151. But cf. *Southern Utilities Co.* v. *Palatka*, 268 U. S. 232, 233.

[25] §§ 163, 163a, 196, notes 3 and 4, *supra*.

utility was chargeable with notice in 1930 of the rule in Texas, restated in the Texarkana charter, that rate regulatory power remains in the municipality, and the charter provision to that effect was reserved in the franchise by force of law. It contracted, nevertheless, to furnish the Texas city gas at the same rates as Arkansas consumers enjoy. There appears no reason why such an agreement should not be enforceable and, in our view of the Texas law, it is.

*Applicability.* The trial court determined that § IX was not to be applied to the period prior to December 1, 1933; that it should be applied to the period December 1, 1933, to February 16, 1934, and that the effort to recover refunds for the period after February 16, 1934, was premature. The Circuit Court of Appeals thought the section, if valid, generally inapplicable. We are of the opinion that the language of the section was intended to and does make applicable to each Texas consumer the same rates that Arkansas consumers are charged for similar uses and quantity, when the Arkansas rates are lower than the rates granted Texas consumers by the ordinance of the City of Texarkana, Texas, of June 13, 1930. This flows from the words in § IX "place in any rates" less than the Texas ordinance rates.

The lower rates for Texas are to be effective only when the utility is "finally compelled to, or should voluntarily, place in" effect the lower rates for Arkansas. When a rate is voluntarily placed in effect in Arkansas, the Texas consumers are immediately entitled to the same rate. We construe "finally compelled" as meaning the entry by a court of the final order which makes effective a challenged rate order. No right to demand the lower rate and no cause of action to enforce the right arises until that time. When such order is entered, however, the Texas consumers are entitled to have the lowered rate applied to their consumption for the same period of time

it is enjoyed by the Arkansas consumers. The purpose
of the clause was to give Texas consumers the advantage
of lower Arkansas rates for similar periods of time. Liti-
gation, regardless of its merit, may not stay the begin-
ning of the lower Texas rate. In our view, so much of
the relief sought as was based upon the challenged rate
order of December 22, 1933, was premature.[26] As there
was an appeal from the decree of December 4, 1936, it
was ineffective to create a cause of action when the sup-
plemental petition of December 30, 1936, was filed.

Leave to file a supplemental petition to bring to date
the controversy over the refund of rates, collected subse-
quent to February 16, 1934, should be granted, upon the
return of the case to the District Court, on motion of the
City of Texarkana, Texas. The present action is an ap-
propriate proceeding for the settlement of the entire rate
controversy and the refund of such sums as may be de-
termined, ultimately, to be due the Texas consumers.[27]
Where there is a good cause of action stated in the origi-
nal bill, a supplemental bill setting up facts subsequently
occurring which justify other or further relief is proper.
If the original decree in the trial court had not been en-
tered, this supplemental petition would simplify the con-
troversy.[28] We think this procedure is equally applicable
after remand for further proceedings.[29]

---

[26] *Atlantic & Pacific Tea Co.* v. *Grosjean*, 301 U. S. 412, 429.

[27] Rule 15d, District Court Rules, September 1, 1938. Cf. Rule 34,
Federal Equity Rules, 1912.

[28] *New York Security & Trust Co.* v. *Lincoln St. Ry. Co.*, 74 F.
67, 68; *Banks Law Pub. Co.* v. *Lawyers' Co-operative Pub. Co.*, 139
F. 701; *Kryptok Co.* v. *Haussmann & Co.*, 216 F. 267; *Milo Manor,
Inc.* v. *Woodard*, 67 App. D. C. 296; 92 F. 2d 220, 223. Cf. *Clarke* v.
*Boysen*, 264 F. 492, 496, a closed account cannot be reopened.

[29] Cf. 2 Daniell's Chancery Pleading and Practice, 6th Am. Ed., pp.
1536, n. 6, and 1537. For further action after decree, see *Mitchell
Coal Co.* v. *Pennsylvania R. Co.*, 230 U. S. 247, 266; *Morrisdale Coal
Co.* v. *Pennsylvania R. Co.*, 230 U. S. 304, 314; *Rio Grande Dam Co.*
v. *United States*, 215 U. S. 266, 274.

Other suggestions to support the respondent's position that § IX is invalid are made. It is said that it is vague, indefinite and obscure. These have been answered by what we have written. The issue of confiscation tendered by the answer of the utility to the petition to enforce the obligations of § IX need not be considered in this proceeding. If the utility has entered into a binding contract as to rates, their confiscatory character is not a defense to the claim of the city to service at the contract rates.[30]

*Reversed.*

MR. JUSTICE McREYNOLDS and MR. JUSTICE BUTLER are of opinion that the decision of the Circuit Court of Appeals is right and that its judgment should be affirmed.

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

---

[30] Cf. *St. Cloud Public Service Co.* v. *St. Cloud,* 265 U. S. 352; *Henderson Water Co.* v. *Corporation Comm'n,* 269 U. S. 278; see *Southern Iowa Elec. Co.* v. *Chariton,* 255 U. S. 539, 542; *Paducah* v. *Paducah Ry. Co.,* 261 U. S. 267, 272–73; *Georgia Ry. & Power Co.* v. *Decatur,* 262 U. S. 432, 438–39; cf. *Columbus Ry., Power & L. Co.* v. *Columbus,* 249 U. S. 399, 410.