**BESSEMER INV. CO. v. CITY OF CHESTER and eleven other cases.**

Nos. 6927, 6917–6926, 6928.

Circuit Court of Appeals, Third Circuit.

June 18, 1940.

Joseph S. Clark, Jr., Carroll Wetzel and Dechert, Smith & Clark, all of Philadelphia, Pa., for plaintiffs-appellants and plaintiffs-appellees on cross-appeals.

George F. Baer Appel, of Philadelphia, Pa., A. A. Cochran and J. DeH. Ledward, both of Chester, Pa., and Townsend, Elliott & Munson, of Philadelphia, Pa., for defendant-appellant and defendant-appellee on cross-appeals.

Before BIGGS, CLARK, and JONES, Circuit Judges.

CLARK, Circuit Judge.

It is impossible to speak of "the facts" at bar with anything approaching sufficient emphasis on the plural number. There are six cases and twelve appeals. Seventy-four serial issues of street improvement bonds are in suit. Their respective dates of issuance by the defendant city range from 1923 to 1933. Each issue is payable within ten years from a special fund—the proceeds of a corresponding special paving assessment. The assessment in turn covers a number of parcels of real estate owned by persons in (by hypothesis) varying degrees of affluence. So one issue is dissimilar from the next not only in point of time, but also with respect to the composition of the special fund; and the latter dissimilarity embraces all the multiple diversities between habitations and between their inhabitants. In addition the ten year maturity period has (as of the time action was commenced by plaintiff bondholders in 1937) expired as to some issues but not as to others. A further complication is presented by a curiously inconsistent overlap between the controlling Pennsylvania decisions and the equally controlling Pennsylvania statutes. Those statutes and decisions, moreover, lie in the none too smooth field of municipal law and economics. Therefore, in the hope of making confusion less confused, we accord more than usual emphasis to the general, before proceeding to the particular.

Municipal financing by way of special assessments, i. e.: charging the cost of public improvements against the abutting property "benefited" thereby, has been traced back to colonial times, see Rosewater, Special Assessments, 11 Studies in History, Economics, and Public Law, Columbia University, No. 3 (1893) 22. It became popular in the era of tremendous municipal expansion following the Civil War. In accordance with a custom, which soon became incidental to the system, improvement contractors would agree to accept their compensation from the proceeds of the special assessment alone, without recourse to the general credit of the city, 2 Dillon, Municipal Corporations §§ 827, 860, 893. This had at least one advantage. The city's obligation to pay from a special fund was not considered an indebtedness to be met by future taxation, and hence did not come within the scope of constitutional debt limits. See Pennsylvania Constitution of 1874, Art. 9, § 8, P.S.; Municipal Improvements as Affected by Constitutional Debt Limitations, 37 Columbia Law Review 177, 188 (comment). The next step was, of course, the crystallization (by enabling statute) of the city's obligation to the contractor into a marketable form—the improvement bond. The Pennsylvania Act of May 23, 1889 is typical. It applies to cities of the third class and reads: "In making improvements where the cost thereof is to be paid by assessments, in whole or in part, upon property abutting or benefited, the city may issue improvement bonds, based solely upon the assessments for such improvements, and imposing no municipal liability." 1889 P.L. 277, continued 1931 P.L. 932, Art. 27, § 2705, 53 P.S. § 12198—2705.

When such bonds are defaulted the bondholders' usual remedy is by way of mandamus to compel the levy of the underlying assessments, or their collection, or both. See Municipal Liability Upon Improvement Bonds, 44 Harvard Law Review 610, 613 (note). So only the proceeds of assessments can ever be availed of to cure the default, and the strict tenor of the improvement bond obligation is observed. The contest, in its essence, is between the bondholders and those liable to special assessment. When, however (as here), some sort of general liability is sought to be imposed on the municipality, which cannot, or may not, be satisfied from the assessments, the conflict widens and includes general taxpayers as well as special assessees. This

leads to a delicate balance of interests and equities.

The general taxpayer's position is founded upon the traditional theory of special assessments. Why should his theoretically unbenefited property be charged with the cost of an improvement which has theoretically benefited the property of another? By the same token, why should a special assessee, who has paid his assessment, be forced to pay more than his fair share of the cost of the improvement in general taxes? Some courts and writers have accordingly confined their sympathies to the general taxpayers, and denied recovery dehors the assessments under any circumstances. See 2 Elliott, Roads and Streets § 765. This view is, however, open to criticism on three grounds.

In the first place, it leaves out of account the fact that improvement bond defaults are often the result of administrative bungling in the levy and collection of assessments. Analogy to the doctrine of respondeat superior requires that the general taxpayers answer for the negligence of their elected representatives. Second, the interest of general taxpayers in maintaining municipal credit is underestimated. The average investor is not apt to make fine distinctions between a city's reputation for meeting improvement bonds, and its reputation for meeting general obligations. Yet, even if such a distinction is made, the general taxpayer does not escape potential harm. As a possible future special assessee, he may have to pay the price of past improvement bond defaults in the correspondingly increased cost of improvements so financed. See Bickner, Washington's Default Bonds Not To Be Redeemed, 16 National Municipal Review 493. Third, too close a correspondence is assumed to exist between the fact of the improvement being made and the fact of a benefit to the special assessees. Emphasis on that benefit postulates a lack of unjust enrichment to the general taxpayers. But the benefit, especially of paving, is in reality often neither restricted to the special assessees nor in any way commensurate with the amount of their assessments. A learned writer on municipal finance has this to say on the subject:

"It may seem paradoxical to say that the basic assumption underlying the special assessment is at once sound and unsound. It would perhaps be more accurate to say that it is sound but has been sadly overworked, thus leading to serious errors in planning and financing improvements. If and when government expenditure on improvements creates special property value increases and this is what is really meant by benefits, then the theory is sound. Under such circumstances it is possible to levy and collect assessments to pay part, at least, of the improvement cost. It is also appropriate to do this, in view of the factors that produced the value increase.

"The difficulty has been in too great reliance, probably, upon the older assumptions with respect to land values and the effect of improvements upon them. At the same time too little attention has been given to the equalizing influences of modern transportation agencies, especially the motor vehicle. Population increase probably produces slowly rising values of strategic land sites, but it is a process which may at the same time be undermined, delayed or diffused by transportation improvements. The benefits imputed to any one section from a road or street improvement may be in fact neutralized by extending the road on to some other section. Accessibility, once the great source of advantage from street paving, loses its premium when all the streets are paved and all highways are surfaced, and when fifty miles means no more in time than five or ten miles once meant.

"The universal use of the special assessment means that some amount of value increase is always imputed or assumed. Even the courts will not contradict the assumptions of administrative officers on this point, and the consequence is that some part of the cost is always locally assessed when in fact there may be no benefit. The administrative assumption may not always be carefully considered, for the expansionist urge of various groups is always pressing on the governing body, seeking the development of new subdivisions, the widening of streets, and all of the other kinds of improvements which it is hoped will be paid for by special assessment levies." Lutz, Public Finance, Chapter 14, Administrative Revenues, 308.

Of these three grounds, the first seems to have had by far the greatest influence on the judicial mind. The decisions in many jurisdictions turn upon the question of negligence. The gist of them is well put in the Harvard Law Review article above cited: "* * * These cases agree that it is the duty of the municipality to levy ef-

fectively and to collect promptly. Drawing analogy from an individual's promise to pay from a particular source, some courts consider the duty as one arising from an implied contract. Under this theory the city is held to guarantee that it either has imposed or will impose a valid special tax, and to contract by implication to use due diligence in collection. Approached from another angle, the enabling act from which the municipal corporation derives its powers generally contains a direction to take the steps necessary to create the fund. Other courts, from this point of view, regard the action as one sounding in tort for breach of this statutory duty." Municipal Liability Upon Improvement Bonds, 44 Harvard Law Review 610, 611, 612 (note).

So the courts of Pennsylvania, proceeding upon the theory of an implied contract of diligence, have often held cities generally liable up to the unpaid face value of due improvement bonds as damages for the breach of such a contract.[1]

The Pennsylvania Legislature, on the other hand, appears to have acted upon the second and third grounds. Validating statutes,[2] passed in 1929, 1931 and 1933 respectively, transmute improvement bonds theretofore issued into general obligations of the city, but only to the extent that the outstanding amount of such bonds is within the limits of indebtedness permitted by the Constitution. They remove, in short, the special fund aspect of the improvement bond. As applied to paving bonds these enactments affect the general taxpayers in precisely the same manner as the earlier enactment which authorizes the issuance of general obligation bonds to meet the cost of specially assessed street improvements, 1893, P.L. 453, 53 P.S. § 592, continued 1931 P.L. 932, 53 P.S. § 12198—3310. The constitutionality of the general obligation statute has never even been challenged, and that of the validating acts has been convincingly upheld whenever adjudicated.[3] Both saddle general taxpayers with the burden of improvements insofar as that burden is not, for one reason or another, borne by special assessments. Both by that token deny implementation to the orthodox (commensurate benefit) concept of special assessments, the practical shortcomings of which are discussed above. And both, though most especially the validating acts, tend to accomplish a strengthening of municipal credit, which benefits special assessees and general taxpayers alike.

In legal strictness the validating statutes and the case law theory of an implied contract of diligence seem inconsistent. If an improvement bond is, by statute, no longer a special fund obligation, it is difficult to rationalize any duty to provide a special fund with diligence. Nevertheless, the law of Pennsylvania contemplates the simultaneous independent existence of both the general obligation and the duty. That must be so because two improvement bond cases, though both covered by the statutes, have nevertheless been decided by the highest state court on the theory of negligence without a holding that the statutes were either inapplicable or unconstitutional, Price v. Scranton, above cited; Palmer v. City of Erie, above cited. In the Palmer case the court specifically declined to pass upon the constitutionality of the validating acts. Cf. Commonwealth v. Harrisburg, 335 Pa. 202, 6 A.2d 863.

It happens, therefore, that the rights of plaintiff bondholders can be measured by either of two yardsticks; one, the statutory general liability of the city (if the statutes are constitutional) ; the other, the city's liability in damages for breach of a contractual duty of diligence (if the

---

[1] Addyston Pipe & Steel Co. v. City of Corry, 197 Pa. 41, 46 A. 1035, 80 Am. St.Rep. 812; Gable v. Altoona, 200 Pa. 15, 49 A. 367; O'Hara v. Scranton, 205 Pa. 142, 54 A. 713; Dime Deposit & Discount Bank of Scranton v. Scranton, 208 Pa. 383, 57 A. 770; Dale v. Scranton, 231 Pa. 604, 80 A. 1110; Nolan v. Reading, 235 Pa. 367, 84 A. 390; Price v. Scranton, 321 Pa. 504, 184 A. 253; Palmer v. City of Erie, 337 Pa. 5, 9 A.2d 378; see also, Barber Asphalt Paving Co. v. Harrisburg, 3 Cir., 64 F. 283, 29 L.R.A. 401; compare First Catholic Slovak-Union of U. S. v. Scranton, 311 Pa. 500, 167 A. 34.

[2] 1929 P.L. 509; 1931 P.L. 929, 53 P. S. § 1895; 1933 P.L. 1466, 53 P.S. § 397a.

[3] Palmer v. City of Erie, 20 Erie 400; Vansciver v. Borough of Sharon Hill, 33 Pa.Dist. & Co.R. 383; In re Indebtedness of City of Easton, 25 Northampton County Rep. 347; Swan v. Fountain Hill Borough, 33 Pa.Dist. & Co.R. 176; and see also, American County v. Lakeport, 220 Cal. 548, 32 P.2d 622. See also the learned opinion of the court below, Bessemer Investment Co. v. City of Chester, D.C., 22 F.Supp. 311.

breach is established). The two are not necessarily of the same length. General liability may, of course, exceed contractual liability for negligence where the negligence is slight and its consequences can be clearly traced. The converse may also be true. For the non-performance of an obligation to pay money does not by definition coincide in point of time with the non-performance of an obligation to use diligence. The cases at bar afford an example. The bonds here are payable "within ten years". Many of them had not "matured" when suit was brought within ten years of their issuance. If, as the learned trial judge held, the validating acts transformed improvement bonds into general obligations, there can be no liability on the unmatured bonds, because the time for performance (payment) has not yet. arrived. It may be, however, that implied promises of diligence have already been broken with respect to both matured and unmatured bonds. Damages in that event could be greater than recovery under the statute. This possibility, we think, becomes an actuality on the record before us. Consequently, any consideration of the constitutionality of the validating acts is superfluous, and may be left (in accordance with the spirit of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487) to the determination of the Supreme Court of Pennsylvania when occasion finally arises.

█ The administrative bungling we have mentioned is nowhere more apparent than in what might be called the accountancy of the bond issues in suit. The defendant city does not seem to have been aware of the almost hair-trigger precision which must accompany improvement bond financing. See Hackett, The Problem of Special Assessments, 23 National Municipal Review 466. It did not even segregate the monies collected from assessments to the corresponding bond issues. As a result there is an admitted shortage of some $26,000 in its paving fund account, representing collections improperly diverted from the satisfaction of bonds. By failing to redeem bonds when there were sufficient funds to do so, the City Treasurer further depleted the paving fund by some $9,000 in unwarranted interest payments. We say unwarranted because bonds were issued up to the full amount of unpaid assessments, and the assessees had the option to pay in ten year instalments with interest (roughly corresponding to bond interest) or in a lump sum without interest. Hence unless bonds were promptly redeemed, interest bearing bonds become outstanding against paid up and non-interest bearing assessments, and eventual shortage in the paving fund would be mathematically inevitable. Finally in six instances the city perpetrated the stock blunder of issuing bonds against invalid assessments, so diminishing the funds available for the issues payable therefrom by some $12,000. This course of municipal conduct clearly amounts to negligence.

The issue of negligence with respect to the city's attempts to collect delinquent assessments presents greater difficulty. By way of background one may observe that delinquencies were from the outset treated in rather cavalier fashion. In a great majority of issues some assessments were already delinquent at the time of issuance. It is only fair, however, to say that the record does not disclose how many, if any, of these delinquencies were later collected, nor does it indicate the relative proportions of delinquencies collected prior to suit and of those remaining uncollected. The omission is logical in view of the fact that successful collections result in retirement of bonds or interest payments pro tanto. The cases at bar involve, by hypothesis, unretired bonds and defaulted interest payments. Hence our concern is with the city's lack of success in the collection of delinquencies still outstanding at the time of suit. Its failures to so collect have occurred despite (1) the filing and preserving of proper tax liens, (2) the mailing of polite notices of delinquency by the city solicitor, and (3) the probably less polite dunning of delinquents by special collectors in the years 1933 and 1934. On the other hand, the city has taken no steps to force the involuntary satisfaction of the assessments; no liens have been foreclosed, and no actions of assumpsit on the assessments have been brought in personam against delinquent property owners as provided by statute. See 1919 P.L. 786, and 1929 P.L. 527, 53 P.S. § 482, continued 1931 P.L. 932, 53 P.S. § 12198—4601.

█ It is clear, we think, that the city's duty of diligence required it to force collection by all available legal means unless resort to such means would be ineffectual, in which case the city must demonstrate that ineffectuality. Our conclusion is derived by analogy from the law governing the conduct of those under a duty to

enforce claims such as trustees,[4] executors and administrators,[5] or trustees in bankruptcy.[6] As stated in a leading text:

"It is not enough for the executor to apply for payment through an attorney; he must follow the collection actively by legal proceedings unless he can show that such proceedings would have been futile and vain." 1 Perry on Trusts, 7th Ed., § 440, p. 735, and by the highest court of Pennsylvania: "A mere application for payment, without more, would not have availed him. To entitle him to a credit, he must, in addition, prove that he took legal steps to recover the sum due, or that, from the notorious insolvency of the debtors, a suit would have been useless." Johnston's Estate, 9 Watts & S. 107, 109. See also Shaffer's Appeal, 46 Pa. 131; Carr's Estate, No. 1, 24 Pa.Super. 369, 9 Del. 233; Skeer's Estate, 236 Pa. 404, 84 A. 787, 42 L.R.A.,N.S., 170; and compare Webb's Estate, 165 Pa. 330, 30 A. 827, 44 Am.St.Rep. 666. We may add that the analogy, in our circumstance, between a trustee, and a municipality obligated to collect and pay over a special fund is hardly far-fetched. No less an authority than the Supreme Court has adopted it, New Orleans v. Warner, 175 U.S. 120, 131, 132, 20 S.Ct. 44, 44 L. Ed. 96. See, also, 6 McQuillan on Municipal Corporations, § 2428. Furthermore, it applies a fortiori, because the trustee's failure to collect involves no element of unjust enrichment, as does that of the municipality in the case of paving assessments. That being so, we think the defendant city should make a convincing showing that aggressive legal action would have been futile, or in the words of the Pennsylvania cases, that it had a "reasonable excuse", Dale v. Scranton, above cited, for not collecting.

■ The record before us contains no such showing. One may postulate the extraordinary difficulty, but not the impossibility of collecting special assessments during the depression. That impossibility could, of course, be cogently demonstrated by pointing to representative instances where legal steps were taken but without success. Such instances being non-existent in the cases at bar, defendant's position finds its only support in a less satisfactory comparison. The city fastens upon the dismally meager returns from a public real estate auction conducted in 1932. This, to be sure, tends to show that foreclosure sales might have met with the same fate. On the other hand, the tendency is a remote one; for the auction sale differed in several of its conditions from a foreclosure sale. The parallel, moreover, offers little excuse in the many instances where it appears that the city could have foreclosed long delinquent assessments, either before the depression, or before the piling up of prior liens for delinquent general taxes, sewer rates, etc., obliterated the equity in the property. Finally, the expediency of foreclosure has no bearing upon the efficacy of assumpsit actions on the assessments. There is no proof that any special assessee was insolvent. One of defendant's collection agents testified vaguely as to the apparent destitution of some, but they were not identified, nor was it even made clear, whether or not their assessments were actually paid. All in all, if the city wished to hazard the bondholders' money on its guess that collections could not be forced, that guess, we think, should proceed, not upon hints of unforecloseability and insolvency such as appear in this record, but upon concise data, easily producible in the event of litigation.

■ We hold, therefore, that the city violated its contract of diligence, (1) by diverting collected funds from the retirement of appropriate issues; (2) by withholding collected funds from the retirement of appropriate issues so as to cause a shortage in interest; (3) by failing to collect funds because invalid assessments were made; and (4) by failing to collect funds because nothing more than voluntary payments were insisted upon, Palmer v. City of Erie, above cited, and cases there cited. One, two, three, or all of these breaches, occur in each of the bond issues at bar. The presence of the first three is, by hypothesis, unaffected by the fact that the issue had or had not matured by the time the actions were brought. Maturity does, however, have a bearing on the existence of the fourth breach. If the issue

---

[4] 2 Scott on Trusts § 140; 3 Bogert, Trusts and Trustees § 592, and see Stiles v. Guy, 16 Sim. 230, 39 Eng. Ch. 229; In re Brogden, L.R., 38 Ch.D. 546; O'Connor v. Gifford, 117 N.Y. 275, 22 N.E. 1036.

[5] 23 C.J. 1203–1207; and see 2 Williams on Executors 1185.

[6] In re Reinboth, 2 Cir., 157 F. 672, 16 L.R.A.,N.S., 341.

has not yet matured, but is nevertheless capable of being paid in full prior to maturity, long standing delinquency coupled with absence of legal steps to ensure collection, is not tantamount to negligence. Those steps may be taken prior to maturity and the bondholder paid in full within the time payment is promised to him. The failure to enforce collection does not, therefore, entail the unreasonable risk of harm that is implicit in the notion of negligence. That risk increases, of course, as maturity approaches, but the line may best be drawn at maturity when the risk ends and actual financial injury to the bondholder begins. In two exceptional situations, however, negligence must be predicated upon a failure to enforce delinquent collections prior to maturity. The first is where enforcement is neglected in the face of interest defaults—a clear financial injury to the bondholders. The second is where such neglect has persisted until the assessments securing an unmatured issue can never be collected in full (here, by increase of other liens, decline in property values, and the running of the three year limitation period on assumpsit actions). In that event, the inevitable future default is a tangible present injury to the bondholders. Both situations are frequently instanced in the record.

The question of damages affords a final complexity. In the case of matured issues, the Pennsylvania decisions sanction the recovery of the face amount of the bonds plus interest due and unpaid. Upon analysis such recovery may be seen to stem from two sources—collections on assessments which have become absolutely payable (contemporaneously with maturity of the bonds secured) and amounts raised by general taxes. The former do not in any sense represent damages for breach of contract, but constitute rather a sort of specific performance, insofar as is possible, of the city's undertaking on its bonds. The latter correspond with the loss to the bondholders from the city's failure to perform its promise of diligence. They are, in effect, consequential damages imposed upon the general taxpayers. It is not necessary to calculate them, however, for the simple reason that, when added to the sums already due on the assessments, they will always produce the full recovery allowable under the Pennsylvania practice.

In the case of unmatured issues, on the other hand, the underlying assessments are not yet payable. Their proceeds, as a result, cannot be merged into a full recovery, and the consequential damages must be calculated independently. Such damages should be measured in accordance with the amount of the defaults in that issue occasioned by the four breaches of contract we have enumerated singly or in combination as the case may be. As of the time suit was brought, those defaults are of two types, past interest defaults, and inevitable future defaults in interest, principal, or both. The amount of the latter should, of course, be appropriately discounted.[7] Such, we think, is the proper theoretical measure of damages. Its practical application may be greatly simplified by the fact that out of the fifty-four unmatured issues on which suit was brought all but eleven have since, in fact, matured. As to those eleven the amount of inevitable future defaults, if any, must and can be predicted from the data underlying the learned trial judge's findings concerning the future solvency of those issues. But a similar prediction with respect to the remaining forty-three can be not only made, but also checked against what has actually occurred. The check would seem to be fully in accordance with the flexibility afforded by supplemental pleadings under the new procedure. Rules of Civil Procedure, Rule 15 (b), 28 U.S.C.A. following § 723c; City of Texarkana v. Arkansas Louisiana

---

[7] In the words of a standard text: "An award on account of prospective damages is like payment in advance and in fixing the same that fact may be considered and the amount reduced to its present worth." 1 Sutherland on Damages § 124, p. 413. Some authorities have suggested that the discount computation should be made in accordance with the current rate of return on sound investments. See generally, Restatement of Torts § 924, Comment (d); Damages—Calculation of Present Value of Future Salary Payments, 33 Columbia Law Review 1255 (note); Damages—Employment Contracts—Present Worth, 11 New York University Law Quarterly Review 288 (note); Damages, Determination of Present Value of Future Earnings—Applicable Rate of Discount, 21 Minnesota Law Review 750 (note). The Pennsylvania rule, however, appears to be that the legal rate of interest (6%) should be employed, Windle v. Davis, 275 Pa. 23, 118 A. 503, and see 17 C.J. 906.

Gas Co., 306 U.S. 188, 59 S.Ct. 448, 83 L. Ed. 598.

Our views on the status of unmatured bonds may best be recapitulated by reference to a concrete example. The issue covering improvements on West Parkway Ave., from Edgmont Ave. to Howard St., and from Howard St., West Parkway Ave. to Elkington St., will not be due until March 2, 1941, R. 198. Yet some of its underlying assessments were already delinquent when the bonds were first issued in 1931, R. 166. The city took no legal steps to collect delinquent assessments, either by way of foreclosure, R. 166, or assumpsit action, R. 167. When suit was brought on May 4, 1937, the claims of the bondholders could never be met in full from the assessments, R. 171, and interest payments had not been made for more than a year, R. 146. So, despite this present (interest default) and inevitable future (incurable insolvency of the issue) injury to the bondholders, the city was content to rely upon persuasion rather than process in the collection of assessments. That, as we have seen, was a negligent course of conduct, constituting a breach of the implied contract of diligence. The breach, by definition, occurred before action was commenced. It would also appear that some $231.41 collected was improperly diverted to the satisfaction of interest and principal of other issues, R. 199, 169. Since bonds were issued up to the full amount of the assessments, this diversion would seem to contribute to the inevitable default at maturity. We have, then, a combination of two breaches of contract, they being of the first and fourth types we have enumerated. Consequential damages for those breaches are, as one would expect, the sum of interest due and defaulted prior to suit plus an amount sufficient presently to indemnify the bondholders against the inevitable future default in principal, and, as might possibly take place, in interest as well. The calculation of that amount (since no check, except for interest defaults, can be made for a year to come) may be derived from specific scrutiny of the facts upon which the trial court's positive, though general, finding of inescapable future insolvency, R. 171, is based.

 The learned trial judge proceeded under the validating statutes to the exclusion of the case law theory of contractual due diligence. As a consequence he entered judgments for the unpaid principal and interest of matured bonds, and for the unpaid interest on unmatured bonds. He was not constrained to and did not consider the scope of recovery under the case law theory which we have applied. That recovery, as we have seen, corresponds with the judgments entered in all respects save one. It includes, in addition, damages for inevitable future defaults in unmatured issues. The computation of those damages is properly within the province of the trial court, and the cases must be remanded for that purpose, and for that purpose only.

The judgments of the District Court are accordingly reversed insofar as they omit damages for inevitable future defaults in unmatured issues, and the causes remanded for the determination of those damages and the entry of judgments for the plaintiffs in accordance therewith. In all other respects the judgments of the District Court are affirmed.