## HEARST v. AMERICAN NEWSPAPERS, Inc., et al.

Civ. A. No. 297.

District Court, D. Delaware.
July 29, 1943.

James R. Morford, of Marvel & Morford, of Wilmington, Del., for plaintiff.

Clarence A. Southerland, of Southerland, Berl & Potter, of Wilmington, Del., for defendant Clarence J. Shearn.

Clair J. Killoran of Wilmington, Del., for American Newspapers, Inc.

William Prickett, of Wilmington, Del., for Edward J. Clark, and others successor trustees.

LEAHY, District Judge.

■ The manifold and confusing aspects of this case, the variety of alternative prayers for relief, have made it difficult, at times, for the court to keep the real issue in focus. With diversity and amount in controversy present, I base jurisdiction on Perrine v. Pennroad Corporation, 19 Del.Ch. 368, 168 A. 196; Bouree et al. v. Trust Francais, 14 Del.Ch. 332, 127 A. 56; and Jellenik v. Huron Copper Min. Co., 177 U.S. 1, 20 S.Ct. 559, 44 L.Ed. 647, because the res is here. We must approach the issue and determine the rights of all parties as of March 16, 1942.

The basic question then to which Shearn's motion for summary judgment is directed is whether the Voting Trust Agreement, which by its terms is irrevocable, may be terminated by the March 16, 1942 notice of the sole depositing shareholder, without the consent of the trustee and, as of the date of the notice, without the consent of the lending banks, such consent being by the provisions of the agreement necessary concomitants to effect such termination.

Plaintiff meets this challenging question by saying, (1) the orginal trust agreement gave the banks no interest in the subject matter of the trust and no rights thereunder; (2) defendant Shearn, as voting trustee, cannot put forward a defense of nonconsent by the banks, even though the specific provisions of the agreement require as a condition precedent to termination such consent, because he is not in privity with such banks; and (3) as the banks took no affirmative action after the receipt of the March 16, 1942, notice, defendant Shearn cannot plead the rights such banks may have had under the original agreement.

■ I. By its plain terms, the Hearst agreement is to continue until June 26, 1947, unless sooner terminated with consent of (1) the trustee, (2) a majority in interest of voting trust certificate holders, and if at any time there be outstanding bank loans made upon the faith of the existence of the agreement, (3) the consent of the lending banks. These are obviously lawful provisions which the signatories had the right to embody in the agreement.[2] The Restatement[3] has attempted to envisage the situation here, i.e., where persons make

---

[2] Sec. 18 of The General Corporation of Delaware as interpreted in Chandler v. Bellanca Aircraft Corp., 19 Del.Ch. 57, 67, 162 A. 63.

[3] The Restatement of the Law of Trusts (Ch. 10, Sec. 330(1) states: "The settlor has power to revoke the trust if and to the extent that by the terms of the trust he reserved such a power."

Paragraph j of the Comment reads (p. 994): "If the settlor reserves a power to revoke the trust only in a particular manner or under particular circumstances, he can revoke the trust only in that manner or under those circumstances."

Paragraph l of the Comment reads in part (p. 995): "Where power reserved to revoke with consent of the trustee. If the settlor reserves a power to revoke the trust only with the consent of the trustee, he cannot revoke the trust without such consent. Whether the trustee can properly consent to the revocation of the trust and whether he is under a duty to consent to its revocation depend upon the extent of the power conferred upon the trustee by the terms of the trust. To the extent to which discretion is conferred upon the trustee, the exercise of the power is not subject to the control of the court, except to prevent an abuse by the trustee of his discretion (see § 187)."

Paragraph m of the Comment reads in part (p. 998): "Where power reserved to revoke with consent of third persons. If the settlor reserves a power to revoke the trust only with the consent of a third person, he cannot revoke the trust without such consent. Whether the third person can properly consent to the revocation of the trust and whether he is under a duty to consent to its revocation depend upon the extent of the power conferred upon him by the terms of the trust. If there is a standard by which the reasonableness of his judgment can be tested, the court will control him in the exercise of the power where he acts beyond the bounds of a reasonable judgment, unless it is otherwise provided by the terms of the trust. If there is no standard by which the reasonableness of his judgment can be tested, the court will not control him in the exercise of the power if he acts honestly and does not act from an improper motive."

Plaintiff leans heavily on other sections of the Restatement—Sections 108, 120, 126, 338 and 339. These sections deal with

loans on the basis of a voting trust agreement, the agreement cannot be terminated by the settlor without their consent, especially where the instrument of deposit contemplates such affirmative consent. In utilizing the corporate instrumentality of the voting trust, modern business has convinced courts that this divorcement of ownership from control is not without practical necessity,[4] especially where—as here, to be particular—the purpose of such voting trust is "to obtain and insure continuity of control for a definite and substantial period of years and thereby, among other things, to facilitate a financial and corporate reorganization of the Company [American] and for its subsidiaries."

The various banks who lent money to the Hearst Companies in an amount in excess of $2,000,000 on the faith of the Voting Trust Agreement appear to be a legal deterrent to Hearst's supposed right to bring about the termination of such agreement in defiance of the explicit provisions of the trust which, clearly, provides the settlor has not reserved to himself the unconditional right to terminate. We are not concerned with the postulates of "beneficiary" and "interested person" as those terms are known in testamentary and inter vivos personal trusts.[5] Such persons ordinarily have either a vested or contingent property "interest", a value which, for most purposes, the law is in a position to evaluate in the hard terms of dollars and cents. But, as the law develops, it is bound to take within its aura of protection certain rights which in daily life cannot be sold over the counter. Thus, when an attempt is made to form a legalistic concept of the various "interests", or who are "beneficiaries" of the corporate device known as the statutory voting trust, courts enter the country of the nuance, not the land of the absolutes. So, here, when Hearst supplicates a financial institution to advance his companies substantial sums on the say that he has committed himself to a definite line of ac-

tion, via a voting trust, which will remain static during the life of the loan, such legal relation of the owner with respect to his own property should not be changed without the consent of the lender for the latter's rights are something in the nature of —if not a legal—at least an equitable interest which courts are bound to protect. It matters little whether the lending banks could have maintained an action to enforce the voting trust agreement. The question is whether a court should ignore a written contract, regard it as meaningless, and aid a party to violate its express provisions.

The banks are within their rights in treating the March 16, 1942, notice of termination as a nullity. While they may have had the legal right to call their loans or sue for damages—if such they sustained as a result of the attempted revocation— they likewise had the protection of the specific provisos of the agreement insuring them that the Voting Trust Agreement would not be revoked unless they consented.

I reject plaintiff's arguments that Shearn has no right to urge the position of the various lending banks. Even though the banks are not formal parties to this proceeding, they have the right to assume that their rights will be recognized as, in this proceeding, the court is sitting as a court of equity, with the duty of ascertaining every fact, and then applying the correct rule in an effort to do justice to all parties who may in any way be affected by its decree. Plaintiff sought out this court and now seeks its aid in striking down an agreement of legal solemnity. This is the traditional case where the Chancellor cautiously examines each bit of evidence in order to see that rights of others, regardless of their presence, are not jeopardized. Plaintiff's fire directed at Shearn's right to sustain the trust is mis-directed. Equity imposes on a trustee the duty of defending the integrity of his trust, if he has reasonable grounds

the questions as to who is a beneficiary and what are the rights where the trust has only a sole beneficiary.

4 Wormser, "Corporate Voting Control", 18 Col.L.Rev. 124; Cushing, Voting Trusts, p. 30 et seq.

5 Elaboration on the differences between the ordinary inter vivos and testamentary trust and voting trust would be a task of superogation. One looks to management and control of property and payment of income to the direct beneficiaries. The vot-

ing trust looks to the voting trustee selecting others to manage the property. An integral part of such selection is, of course, considerations of what selectees will produce in income. In either case, if the settlor selects certain specific provisions requiring the consent of the trustee and third parties to modification and termination, why should such provisions not receive court sanction if the original owner of the res decides to change his mind?

to believe that the attack is without justification. Perrine v. Pennroad Corp., 19 Del.Ch. 368, 168 A. 196; 3 Bogert, Trusts and Trustees, § 561.

H. M. Byllesby & Co. v. Doriot, Del. Ch., 12 A.2d 603, is not opposed to this view. In that case, Byllesby & Co., a holding company under the definition of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., owned 75% of the common stock of Standard Power & Light Corporation, thus insuring director control over a spreading public utility system. In an effort to by-pass the federal statute, Byllesby entered into a voting trust agreement under the Delaware law. The agreement had a life of ten years, but contained no proviso for earlier termination or revocation. Non-depositing stockholders were not to be let in without Byllesby's consent. The Securities and Exchange Commission refused to recognize the agreement in its considerations of what Standard was required to do to comply with the statute. Byllesby then requested the Trustees to join with it in revoking the voting trust agreement. The trustees refused. Chancellor Pearson properly held that, under the facts before him, the settlor had the right to terminate the trust. The case can be distinguished from the problems presented in the instant case on many fronts. In the first place, it was recognized that, where the settlor gives a third person an interest in the agreement, it cannot be terminated without such third party's consent; here, the lending banks had, as of March 16, 1942, an interest in the deposited shares through their power to insist on the continuance of the exercise of the voting rights by the trustee. Secondly, the Byllesby agreement having failed to receive the administrative imprimatur of the Securities and Exchange Commission, its fundamental purpose had failed; whereas here, at least as long as the lending banks were in the picture, there was an existing necessity to divorce Hearst from control of the corporate enterprise. Thirdly, the Byllesby agreement was silent on irrevocability. However, it did contain a provision that "The Depositing Stockholders hereby severally agree irrevocably to assign, transfer and deliver to the trustees shares of stock, etc." This was a promise which Byllesby made to itself, while in Hearst it was expressly provided that the agreement would be irrevocable as the "Trustee" was "willing to undertake the trusts * * * only upon the condition that said trusts be irrevocable." Moreover, the Byllesby agreement had no conditions requiring the consent of its trustee or a third party to termination.

Alderman v. Alderman, 178 S.C. 9, 181 S.E. 897, 105 A.L.R. 102, has been offered by Shearn as coming as close as any case which has been found to be determinative of the instant case. There, four out of six stockholders deposited their shares with the other two as trustees to vote the stock of the four, to collect and pay any declared dividends. Later the trustees made written acknowledgement of the receipt of the shares and undertook to carry out the terms of what was obviously a voting trust. Then the depositing stockholders sought to have the agreement declared void. The court refused such relief on the theory that there was no suggestion in the agreement that it could be revoked at the whim of the settlors. The court indulged in the presumption that the voting trustees would not have accepted the trust if the grantors could revoke at any time. I am not completely satisfied that this case is controlling authority under the peculiar circumstances in the case at bar.

■ But, for present purposes, I reject the proposition urged by plaintiff's counsel that if Hearst terminated, the lending banks were relegated to calling their loans or suing him for damages. The inclusion of such rights in the original agreement were simply additional remedies.

■ At the same time, I am unable to understand plaintiff's argument that his Voting Trust Agreement is not an agreement at all for the reason that he calls it a conveyance. Most formal inter vivos trusts do take the form of a conveyance, while those testamentary in nature are embodied in a will. And a trust can even utilize a more simple form, viz., the settlor can stand seized to uses as a trustee himself—he agrees with no jural person and nothing leaves him by way of a conveyance. Such formalities are not without historical interest to the legal student. But the present-day conception is—at least, I think it should be—that a voting trust under Sec. 18 of the General Corporation Law of Delaware as it is sui generis may

180

also be a valid and enforceable contract.[6]

Voting Trust Agreements have been used for nearly the last forty years. They are an established technique in our current business world, sanctified not only by Sec. 18 of the General Corporation Law of Delaware, but recognized by the statutes of almost every other state which deals in corporations. If the terms of such agreements can be wiped out by revocable action on the part of stock depositors when they have written into the agreement overtones of irrevocability, it is difficult to see how we can consider certain a contractual arrangement which the profession has been lead to believe is not subject to the incidence of change even through the instrumentality of the courts.

I conclude the March 16, 1942, notice was not sufficient to revoke the June 26, 1937, trust.

II. There still exists the charge that the trustee should be removed for cause. The proposed amendment seeks to elaborate these charges. The amendment as to such detail will be allowed. Defendant Shearn, therefore, has no further need for a bill of particulars on this score. He shall, of course, as is his right, be permitted to answer these alleged charges.

The proposed supplements to the complaint allege acts which have occurred after the filing of the original complaint. This Circuit, fortified by Rule 15 (d) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, has indicated an increasing latitude in the matter of supplemental pleadings. Bessemer Inv. Co. v. City of Chester, 3 Cir., 113 F. 2d 571.[7] The supplemental matters, as one can read from the preceding statements of fact, are concerned with payment of the bank loans which were made in reliance on the original Voting Trust Agreement. The supplements are allowed. If defendant Shearn, under Rule 42 of the Rules of Civil Procedure, suggests that I try the separate issue as to whether the agreement may be terminated without his consent alone, as voting trustee, then the parties may request the clerk for a date for hearing such issue.

In the interim, Shearn's motion for summary judgment on the ground that the March 16, 1942, notice was ineffective either to revoke the June 26, 1937, Voting Trust Agreement or to depose him as trustee thereunder is granted.

---

[6] Cf. Sec. 18 of the General Corporation Law, Rev.Code of Del.1935, § 2050: "One or more stockholders may by agreement in writing deposit capital stock of an original issue [Sic, limited to such issues?] with or transfer capital stock to any person * * * authorized to act as trustee * * * At any time within one year prior to the time of expiration of any such voting trust agreement as originally fixed or as extended as herein provided, one or more beneficiaries of the trust under such voting trust agreement may, by agreement in writing and with the written consent of such Voting Trustees, extend the duration of such voting trust agreement for an additional period not exceeding ten years." The Delaware statute thereafter refers to the document of deposit as an agreement. Not without significance is the statutory provision that any one or all of the beneficial owners of the stock may extend the period of the Voting Trust Agreement with the written consent of the voting trustees.

[7] Cf. also Southern Pac. v. Conway, 9 Cir., 115 F.2d 746; Consolidated Naval Stores Co. v. Brannan Turpentine Co., 46 F.Supp. 273; Bellavance v. Frank Morrow Co., Inc., 2 F.R.D. 9; Otis Elevator Co. v. 570 Bldg. Corp., D.C., 35 F.Supp. 348, 349; Society of European Stage Authors & Composers, Inc., v. WCAU Broadcasting Co., D.C., 1 F.R.D. 264; Cheney Co. v. Cunningham, D.C., 29 F.Supp. 847, 849.