CASE-SWAYNE CO., Inc., a corporation, Appellant,

v.

SUNKIST GROWERS, INC., a corporation, Appellee.

No. 20070.

United States Court of Appeals Ninth Circuit.

· Nov. 21, 1966.

Rehearing Denied Jan. 12, 1967.

450

William Henderson, of Johnson & Harmon, Salt Lake City, Utah, for appellant.

Beardsley, Hufstedler & Kemble, Los Angeles, Cal., for appellee.

Before JERTBERG and ELY, Circuit Judges, and JAMESON, District Judge.

JAMESON, District Judge:

This is an action seeking treble damages under section 4 of the Clayton Act (15 U.S.C. § 15)[1] for alleged monopoly and attempt to monopolize in violation of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).[2] The district court granted the defendant's motion for a directed verdict at the close of the plaintiff's case.[3]

Plaintiff (appellant), Case-Swayne, Inc., is engaged in the manufacture of single strength juices (canned orange juice and blends of orange juice with other fruit juice) as an independent operator. Defendant (appellee), Sunkist Growers, Inc., is an association of citrus producers.[4] It has as its base 12,000 citrus growers in Southern California and Arizona. The growers are organized into local associations which operate packing houses. The associations in turn are grouped into district exchanges and representatives from the exchanges make up the governing board of Sunkist. The Sunkist organization handles its members' fruit in effect from tree to store.

Appellant contends that the district court erred (1) in granting the defendant's motion for a directed verdict; and (2) in ruling that Sunkist was organized in conformance with section 1 of the Capper-Volstead Act[5] and therefore could not be held in violation of section 1 of the Sherman Act for conspiracy to restrain and monopolize trade in product oranges. If Sunkist Growers, Inc., was in fact organized as an agricultural cooperative association pursuant to the Capper-Volstead Act, as the district court found, any interorganizational dealings among the various agricultural cooperative associations are immune from the conspiracy provisions of section

1. 15 U.S.C. § 15 provides:
 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

2. 15 U.S.C. § 1 provides in part:
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *"
 Section 2 provides in part:
 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *."

3. At the close of plaintiff's case, the defendant moved for dismissal under Rule 41(b) F.R.Civ.P. or for a directed verdict under Rule 50(a). The court first indicated that it would dismiss pursuant to Rule 41(b), but later concluded that the motion for dismissal was improper and granted defendant's motion for a directed verdict under Rule 50(a).

4. In addition to Sunkist Growers, Inc., the complaint named Exchange Orange Products Company and Exchange Lemon Products Company as defendants. Subsequently Exchange Orange and Exchange Lemon merged into Sunkist Growers, Inc., which assumed all of the obligations of the merged corporations, and the action was dismissed as to Exchange Orange and Exchange Lemon.

5. Section 1 of the Capper-Volstead Act (7 U.S.C. § 291) provides that, "Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: * * *"

1 of the Sherman Act;[6] but Sunkist may still be found liable under section 2 of the Sherman Act for wrongful use of monopoly power and attempt to monopolize.[7] The question presented under the first specification in error is whether the evidence was sufficient for the jury to find that Sunkist wrongfully used monopoly power or attempted to monopolize trade in product oranges.

■ In ruling on a motion for a directed verdict the trial court is required to view the evidence in the light most favorable to the party against whom the motion is made. "On appeal, likewise, the appellate court must consider the evidence in its strongest light in favor of the party against whom the motion * * * was made, and must give him the advantage of every fair and reasonable intendment that the evidence can justify". 5 Moore's Federal Practice 2316 (2d ed. 1951.) This is true "even though contrary inferences might reasonably be drawn". Continental Ore Co. v. Union Carbide, 1962, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777.

Sunkist controlled approximately 70% of all oranges produced in Southern California and Arizona, and approximately 67% of the oranges diverted to product use. Product or "excess" oranges are those not sold as fresh fruit. They are used to make various orange products and are the only kind used by plaintiff in its business. On a national basis Sunkist controlled 6 to 7% of the total production.

Other small cooperatives controlled for their own use approximately 18% of the oranges grown in Southern California and Arizona. The balance of the oranges, approximately 12%, represented those grown by independent growers and available to independent manufacturers.

Additional facts set forth in the order granting defendant's motion for directed verdict include the following:[8]

(1) Prior to the development of the citrus juice industry there was no market for fruit not required by the fresh fruit market, and the remainder of the fruit, then called "culls", was destroyed by the packing houses. With the development of the citrus juice industry, the demand for culls, now designated "excess fruit", could be sold to processors to convert into juice and other by-products.

(2) At the beginning of its processing activity plaintiff had no difficulty in obtaining at a reasonable price sufficient fruit for its needs. When it was demonstrated that conversion of excess fruit into juice and other citrus by-products was profitable, Sunkist decided to process its own fruit and for that purpose organized Exchange Orange Products Company and Exchange Lemon Products Company.

(3) Fruit not so processed was sold to independent processors, including plaintiff. Sunkist had excess fruit available for sale to independent processors only when it was unable to process its own fruit. For several years Sunkist sold its excess fruit to independent processors by a bid system. All independent processors, including plaintiff, were invited to present bids for fruit to be sold.

(4) As time went on and as Exchange Orange and Exchange Lemon developed processing capabilities, more and more excess fruit from Sunkist packing houses was channeled to Exchange Orange and Exchange Lemon until, at the present time, practically no Sunkist fruit is sold to independent processors.

6. See Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 1962, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305.

7. See Maryland & Virginia Milk Producers Ass'n, Inc. v. United States, 1960, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880;

Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., supra.

8. All of the facts are substantially in the language of the district court, although they do not appear in the court's order in the same sequence.

(5) Plaintiff attempted to obtain from other mutual citrus associations its requirement of fruit to process, only to find that such associations had entered into individual contracts with other processors; hence plaintiff was able to obtain very little fruit supply from mutual associations.

(6) Approximately 12,000 citrus fruit growers annually signed contracts with Sunkist agreeing to sell fruit through the Sunkist organization. The contracts provided that if a grower did not abide by his contract, sanctions might be imposed. Occasionally a grower failed to sell his fruit to Sunkist, and sanctions were imposed by the Sunkist organization.

(7) Sunkist trade-mark or trade name was a valuable asset, and defendant had spent large sums in establishing its trade-mark or trade name.

(8) Sunkist employees observed operations of member growers to make certain that the growers handled their crops through the Sunkist organization and if it was discovered that a member grower sold fruit contrary to his contract, a report was made to Sunkist and, in certain instances, penalties were imposed upon the violating grower.

(9) The Department of Agriculture, pursuant to the school lunch program, requested bids for single strength orange juice. One year Sunkist bid but did not receive the contract and another year, Sunkist bid and was awarded the contract.

(10) Sunkist made a large profit from sale of citrus fruit.

(11) The great majority of citrus grown in Southern California and Arizona goes into the fresh fruit market. The greater amount of oranges grown in Florida goes into the citrus products market. Fresh fruit from California, Arizona and Florida compete on the eastern and foreign markets.

(12) It was possible for processors in Florida to make single strength orange juice, can and ship it to California, and sell it at the same price as (or at a price lower than) the Southern California-Arizona produced juice. Florida processors of single strength orange juice could assimilate transportation costs from Florida to California and sell their product in competition with single strength orange juice made within the Southern California-Arizona area. This was possible because of the lower price for which Florida fruit could be purchased.

(13) The price paid for Florida oranges was the dominant factor in determining the price for which single strength orange juice could be sold to the ultimate consumer.

(14) There is also competition between single strength orange juice and orange juice concentrates. Neither of the parties is a producer of concentrated or frozen juice.

The alleged violations of the Sherman Act arise out of "Sunkist's dominant control of oranges grown in Arizona and California together with its vertical integration and dual distribution with respect to oranges designated for product use * * *". More particularly, plaintiff complains that it was unable to purchase oranges for product use from Sunkist at a price that would enable it to compete with canned juice shipped in from Florida.[9]

The district court's granting of the directed verdict was premised upon the conclusion that the "relevant market" was national rather than limited to California-Arizona, and that in light of this plaintiff had not shown evidence of an illegal monopoly.[10]

9. This is not a complete statement of the alleged monopolistic acts of Sunkist, but it is the act upon which plaintiff places the most emphasis.

10. The district court initially was of the opinion that the relevant market was Southern California and Arizona, but concluded, when all of the evidence was presented, that the relevant market for product oranges was a national market, "and that whatever happened in Florida directly affected prices in California and vice versa. Prices paid for oranges in California depended substantially upon the price for which oranges were sold in Florida".

■ The cases uniformly hold that "a party has monopoly power if it has, over 'any part of the trade or commerce among the several states', a power of *controlling prices or unreasonably restricting competition*". United States v. E. I. du Pont de Nemours & Co., 1956, 351 U.S. 377, 389, 76 S.Ct. 994, 1004, 100 L.Ed. 1264. In determining whether a party has monopoly power it is first essential to define the "relevant market".

■ This court has held that determination of the relevant market, "both as respects products and as concerns geographical area" is a "necessary step precedent to determining whether within that market there was a probability" of violation of section 7 of the Clayton Act. Crown Zellerbach Corporation v. F. T. C., 9 Cir., 1961, 296 F.2d 800, 804, (cert. denied (1962)) 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807. While Crown Zellerbach involved a violation of the Clayton Act with respect to corporate acquisitions, it is clear that the same determination must be made regarding the relevant market in actions for violation of section 2 of the Sherman Act. United States v. du Pont & Co., supra.

In the recent case of United States v. Grinnell Corp., 1966, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778, a civil suit for alleged violations of section 2 of the Sherman Act, the Court said in part:

"* * * That * * * case arose under § 7 of the Clayton Act where the question was whether the effect of a merger 'in any line of commerce' may be 'substantially to lessen competition.' We see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act." (384 U.S. at 573, 86 S.Ct. at 1705).

In determining the "relevant market" applicable in this case, it seems advisable first to analyze separately the factors involved in both the relevant *product* market and the relevant *geographic* market.

## Relevant Product Market

United States v. E. I. du Pont de Nemours & Co., supra, relied upon by the district court in granting Sunkist's motion for a directed verdict, promulgated the test of "reasonable interchangeability" to determine the relevant product market. The Government contended that cellophane was the relevant product market. The Court assumed that if this were true, du Pont would have monopoly power over that market. The Court found, however, that cellophane was "reasonably interchangeable" with other flexible wrappings, and that the relevant product market accordingly was "flexible packaging materials" rather than cellophane alone.

The rule of "reasonable interchangeability" has been refined and modified in subsequent cases. In particular, the courts have recognized that there may be an outer market and one or more inner submarkets within which competitive effects are to be appraised, i. e. a relevant submarket may constitute the product market for antitrust purposes.

In Brown Shoe Co. v. United States, 1962, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed. 2d 510, involving a merger found to be in violation of section 7 of the Clayton Act, the Court said in part:

"The 'area of effective competition' must be determined by reference to a product market (the 'line of commerce') and a geographic market (the 'section of the country').

"The Product Market.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. (citation) The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic en-

tity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." (370 U.S. at 324–325, 82 S.Ct. at 1523).

The rule of Brown Shoe was expressly applied to cases arising under section 2 of the Sherman Act in the recent case of United States v. Grinnell Corporation, supra, where the Court said:

"In § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act (Brown Shoe Co. v. United States, 370 U.S. 294, 325, [82 S.Ct. 1502, 8 L.Ed.2d 510]) there may be submarkets that are separate economic entities." (384 U.S. at 573, 86 S.Ct. at 1704).

*Relevant Geographic Market*

In Brown Shoe, supra, the Court also set forth criteria to be used in determination of the geographic market:

"The Geographic Market.

"The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market. See S.Rep.No.1775, 81st Cong.2d Sess. 5–6; United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593 [77 S.Ct. 872, 1 L.Ed.2d 1057.] Moreover, just as a product submarket may have § 7 significance as the proper 'line of commerce,' so may a geographic submarket be considered the appropriate 'section of the country.' (Citing cases). Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both 'correspond to the commercial realities' of the industry and be economically significant. Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area." (370 U.S. at 336–337, 82 S.Ct. at 1530).

In the recent case of United States v. Pabst Brewing Company, et al., 1966, 384 U.S. 546, 552, 86 S.Ct. 1665, 16 L.Ed. 2d 765, involving the acquisition in 1958 by Pabst Brewing Company of Blatz's Brewing Company, the Court held that the "evidence as to the probable effect of the merger on competition in Wisconsin, in the three-state area (Wisconsin, Illinois and Michigan), and in the entire country was amply sufficient to show a violation of § 7 (of the Clayton Act as amended by the Celler-Kefauver Anti-Merger Amendment) [11] in each and all of these three areas". In 1957, prior to the merger, the two companies had combined sales which accounted for 23.95% of the beer sales in Wisconsin, 11.32% of the sales in the three-state area, and 4.49% of the sales throughout the country.

The Court was unanimous in holding that the district court erred in dismissing the complaint. Mr. Justice Harlan (joined by Mr. Justice Stewart) in a concurring opinion agreed with the district court that viewing the entire continental United States as a relevant market, the evidence did not sustain the Government's contention that the acquisition might substantially lessen competition. They agreed with the majority opinion, however, as did Mr. Justice Fortas, that the Government's evidence was sufficient to establish prima facie that Wisconsin and the tri-state area were proper "sections of the country" in which to measure the probable effects of the acquisition.

In his concurring opinion, Mr. Justice Harlan said in pertinent part:

"The appropriate geographic area in which to examine the effects of an acquisition is an area in which the parties to the merger or acquisition compete, and around which there exist economic barriers that significantly impede the entry of new competitors.

---

11. 38 Stat. 731, as amended, 64 Stat. 1125, 15 U.S.C. § 18 (1964 ed.).

* * *" (384 U.S. at 556–557, 86 S.Ct. at 1671).

Whether a geographical location is or is not an "area of effective competition" is a question of fact in each case. United States v. Columbia Pictures Corporation, S.D.N.Y., 1960, 189 F.Supp. 153, 192. The area may be limited by differences in costs of production and transportation. Erie Sand & Gravel Co. v. F. T. C., 3 Cir. 1961, 291 F.2d 279, 281. "A competitive price disadvantage arising from transportation costs is an important factor in determining the scope of a relevant market." United States v. Penn-Olin Chemical Company, D.Del., 1963, 217 F.Supp. 110, 120; American Crystal Sugar Co. v. Cuban-American Sugar Co., S.D.N.Y., 1957, 152 F.Supp. 387, 398, Aff'd, 2 Cir., 1958, 259 F.2d 524.

█ It seems clear from the decided cases that (1) while the outer limits of the market may be determined by the competition of interchangeable products, (2) there may be a well-defined submarket which constitutes the relevant market for antitrust purposes, which (3) must correspond to the commercial realities of the industry, (4) is affected by price disadvantages due to transporta-tion costs, (5) is affected by availability of a buyer to supply and existence of economic areas which significantly impede competition, (6) is determined in part with relation to the parties affected in the suit, and (7) is a question of fact in the particular case.

We come now to an application of the criteria for determining both relevant product market and relevant geographic market to the facts in this case. In advance of trial it was the position of the trial court, as set forth in its pretrial order, that the relevant product market was product oranges and the relevant geographic market Southern California and Arizona. At the close of plaintiff's case, the court was persuaded that the relevant product market included orange juices and concentrates and that the relevant geographic market was national rather than limited to Southern California and Arizona.[12]

It is clear from the evidence that *orange products* (single strength juice and frozen concentrates) were sold in a national market. Oranges could be processed in Florida, and the juice shipped to California and sold competitively with juice processed in California from Cali-

---

12. In ruling on defendant's motion for dismissal or a directed verdict, following argument by counsel, the court said:

"I was of the opinion that Florida was not a part of the market; that it was to be limited to Southern California and Arizona. I was of the opinion and still am of the opinion that it would certainly be uneconomical to try to ship fresh fruit from Florida or from Texas to California for the purpose of being converted into orange juice. So I have to look first to what is the competition in this case, what are the competitive factors?

"Well, if we include Florida as part of the market, then of course Sunkist does not have a dominant place in this picture at all. It is a very minor part of the conversion of fresh fruit into orange juice, if we consider Florida as a part of the market.

"Then I thought we were talking about product oranges, the monopoly of product oranges. But it seems to me that we now are talking about product oranges, but also about the juice squeezed from the product oranges. I don't know how you can say that there is a monopoly on product oranges without saying there is a monopoly on the juice that is squeezed from product oranges." (Rep.Tr. 1378:1–20).

"So it seems to me that when we talk about competition, we are going to talk about competition not only of the fruit before it is squeezed, but the product after the squeezing, that is the orange juice.

"Well, if you consider it in that light, then there is lots of competition on the shelves of Southern California, because the testimony is that the Florida producers, the Florida producers of orange juice, that is, those who squeeze the oranges to make orange juice in Florida, can ship it to Los Angeles, pay the shipping charges, and undersell the California product.

"So from these two standpoints, that is talking about competition, what is competition—competition is the competition in the open marketplace." (Rep.Tr. 1379:9–22).

fornia oranges. Sunkist held a relatively small part of this national market and controlled neither quantity nor price.

On the other hand, it is equally clear that it was uneconomical for producers of orange products to buy their *product oranges* in Florida or elsewhere than in the Southern California-Arizona area. Sunkist controlled 70% of all oranges grown in this area and 67% of the product oranges. A substantial portion of the remaining product was unavailable to Case-Swayne.

Appellee does not question these facts, but contends that the relevant geographic market for product oranges was national on the theory that the product orange supply is tied irrevocably to orange product price. Appellee argues that product oranges "have value only because they can be converted into a product which has value", and that "the value of product oranges cannot exceed that which will permit them to be processed into products and then compete in a national products market dominated by Florida".

▇▇ While product oranges may have little, if any, value per se, the same is true of many raw products. The market for raw products is among the processors rather than the ultimate consumer. We see no reason why the raw product may not be the relevant product market, even though it has little value in its raw state. Moreover, it is clear from the recent case of United States v. Pabst Brewing Company, supra, that even as to the processed product, the relevant market may at the same time be national, regional, and statewide in area.[13]

▇▇ While Sunkist could not control the supply or price of canned juices because of competition from Florida in these products, there was substantial evidence that it did control the supply of product oranges from which juice was made in California and Arizona. In determining the relevant geographic market, a proper test is the " ' * * * geographic structure of supplier-customer relations.' " United States v. Philadelphia National Bank, et al., 1963, 374 U.S. 321, 357, 83 S.Ct. 1715, 1739, 10 L.Ed.2d 915. The relevant market is determined in part by the market area "to which the purchaser can practicably turn for supplies". Tampa Electric Co. v. National Coal Co., 1961, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580.[14] There is no question that Case-Swayne and other users of product oranges could not as a practical matter obtain product oranges from suppliers outside California and Arizona.

Moreover, even though the price of product oranges in Florida would influence the price of product oranges in California, there was evidence from which the jury might find that Sunkist by reason of its control of the supply also as a practical matter controlled the price.[15] That is particularly true if it

---

13. We concluded in Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co., 9 Cir. 1960, 284 F.2d 1, that the relevant market area for oranges and by-products, including fruits and juices, was the California-Arizona area, although it does not appear that the parties in that case argued or the court considered the distinction between product oranges and orange products or any contention that the market was national.

14. See also Standard Oil Co. of Cal. and Standard Stations v. United States, 1945, 337 U.S. 293, 299, note 5, 69 S.Ct. 1051, 93 L.Ed. 1371.

15. Morgan Ward, who handled the oranges of most of the independent growers, testified in pertinent part:

"Q Is it your opinion, then, that the market conditions with respect to Florida product oranges have more effect on the price of product oranges in California than any one factor?

"A They have effect on the over-all United States. Then those who set prices on the fruit in California look at what is going on all over the United States, and at that time the prices were set in California by the leading growers, Sunkist set it, using all those things to do it, I assume. But the price

should be found that Sunkist refused to sell to plaintiff and other independent buyers at any price.

As Mr. Justice Fortas said in his dissenting opinion [16] in the recent case of United States v. Grinnell Corporation, supra, "The central issue is where does a potential buyer look for potential suppliers of the service—what is the geographical area in which the buyer has, or, in the absence of monopoly, would have, a real choice as to price and alternative facilities? This depends upon the facts of the market place, taking into account such economic factors as the distance over which supplies and services may be feasibly furnished, consistently with cost and functional efficiency." (384 U.S. at 589, 86 S.Ct. at 1713, 16 L.Ed.2d 778).

We conclude that there was evidence from which the jury might properly find that the relevant product market was product oranges and the relevant geographic market Southern California-Arizona.

*Evidence of Wrongful Use of Monopoly Power and Attempt to Monopolize*

If the jury should find that Southern California and Arizona was the relevant market, there was sufficient evidence from which the jury could find further that Sunkist engaged in monopolistic practices or an attempt to monopolize proscribed by section 2 of the Sherman Act.

As the Court said in United States v. Grinnell Corp., supra:

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a conse-

quence of a superior product, business acumen, or historic accident."

\* \* \* \* \* \*

"In United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391 [76 S.Ct. 994, 1005, 100 L.Ed. 1264,] we defined monopoly power as 'the power to control prices or exclude competition.' The existence of such power ordinarily may be inferred from the predominant share of the market. In American Tobacco Co. v. United States, 328 U.S. 781, 797, [66 S.Ct. 1125, 1133, 90 L.Ed. 1575,] we said that 'over two-thirds of the entire domestic field of cigarettes and \* \* \*; over 80 per cent of the field of comparable cigarettes' constituted 'a substantial monopoly.' " (384 U.S. at 570–571, 86 S.Ct. at 1704).

It is clear that Sunkist had possession of monopoly power in the relevant market, if that market is found to be the Southern California-Arizona area.

It is true, as appellee contends, that size alone does not constitute an offense under the Sherman Act; nor does the mere possession of monopoly power. It is the wrongful use and exercise of that power which is proscribed by section 2 of the Act.

However, the ultimate consideration in determining whether an alleged monopolist violates section 2 of the Sherman Act is "whether the defendants control the price and competition in the market for such part of trade or commerce as they are charged with monopolizing." United States v. E. I. du Pont de Nemours & Co., supra, 351 U.S. at 380, 76 S.Ct. at 999, 100 L.Ed. 1264. It is not always necessary to find a specific intent to find that an antitrust law has been violated. "It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct

---

of by-products in this state has ever since I have been in the business since 1934, been set by Sunkist. At one time it was called California Fruit Growers Exchange, and Sunkist at this time." (Rep.Tr. 392:1–14).

16. Justices Fortas, Stewart and Harlan would have remanded for a "new determination" of the basic issue of "the definition of the relevant market".

or business arrangements (citing cases). To require a greater showing would cripple the Act. As stated in United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 432, 'no monopolist monopolizes unconscious of what he is doing.' Specific intent in the sense in which the common law used the term is necessary only where the acts fall short of the results condemned by the Act." United States v. Griffith, 1948, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236.

Appellant contends that Sunkist wrongfully exercised its monopoly power through (1) boycotting appellant by refusing to sell appellant product oranges while selling to other processors; (2) preventing TreeSweet from delivering oranges TreeSweet had committed to appellant; (3) controlling orange prices; and (4) eliminating competitors (or as with appellant, limiting their profits) by maintaining high prices for oranges or reducing supply.

The same acts are relied upon in support of appellant's contention that Sunkist intentionally attempted to monopolize the trade in product oranges in the relevant market. Appellant relies upon additional evidence of such intent in Sunkist's (1) admitted purpose to control all the oranges it could get and utilize all of them in its own manufacturing facilities; (2) preventing Placentia Orange Distributors from fulfilling its promise to sell appellant 5,000 tons of oranges in 1957; (3) policing the Sunkist system to punish violators of the Sunkist "restrictive tying contracts"; (4) wrongful use of dual distribution by lowering single strength juice prices after competing manufacturers had purchased product oranges at prices established by Sunkist; (5) use of consignment contracts and its low 1956 bid (compared with its 1955 bid) to the Department of Agriculture.

Appellee recognizes in its brief that "the key determination by the trial court was that the appellant's evidence * * established the fact that the relevant market for product oranges is a national market", but contends further that "under each of the tests which the courts have applied to determine whether or not a monopoly exists, the appellant's evidence conclusively established that there was no monopoly", and that with respect to each of the acts and incidents upon which appellant relies, Sunkist's conduct was "legitimate, cooperative activity and not undertaken in an unlawful manner or for an unlawful purpose". There is substantial evidence to support appellee's denial of each of the alleged acts of monopoly.

In determining the issues of monopolization and intent to monopolize, however, the evidence must be viewed as a whole. Even though the proof as to each of the specific acts may be insufficient in itself to establish wrongful use of monopoly power, the jury must look at the "whole picture", weigh the contradictory evidence and inferences and draw the "ultimate conclusion as to the facts". See Continental Ore Co. v. Union Carbide and Carbon Corp., supra, 370 U.S. at 699–701, 82 S.Ct. at 1411, 8 L.Ed.2d 777, and cases there cited.

As noted supra, in ruling on the directed verdict this court must give appellant "the advantage of every fair and reasonable intendment that the evidence can justify", and this is true "even though contrary inferences might reasonably be drawn". From a review of the record we conclude that there was sufficient evidence to submit to the jury the question of whether Sunkist wrongfully exercised its monopoly power and intentionally attempted to monopolize the trade in product oranges. We do not find that appellant has established any of the alleged acts of monopoly—only that viewing the evidence as a whole, it has made a prima facie case for the jury.[17]

17. In Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., supra, the plaintiff relied upon some of the acts of monopoly here alleged. We upheld the submission of the case to the jury and the instructions given by the trial court. The

*Section 1 of the Capper-Volstead Act*

Appellant contends that Sunkist is not a person "engaged in the production of agricultural products" under Section 1 of the Capper-Volstead Act because only 80.12% of its members are associations composed of fruit growers, while 4.97% are corporate growers, and 14.91% are private profit-making corporations, individuals and partnerships which market through Sunkist the oranges they have purchased from growers.[18]

The district court concluded, and we think correctly, that under the decision of the Supreme Court in Sunkist Growers, Inc. v. Winckler & Smith Co., supra, Sunkist Growers, Inc., is a cooperative organized in compliance with Section 1 of the Capper-Volstead Act. It is true, as appellant argues, that this issue was not specifically raised in the Winckler case, but the Court did describe the Sunkist organization in detail. This was prior to the merger with Exchange Orange and Exchange Lemon, but the Court concluded that the 12,000 growers were "in practical effect and in the contemplation of the statutes one 'organization' or 'association' even though * * formally organized * * * into three separate legal entities". (370 U.S. at

29, 82 S.Ct. at 1136). The Court also said in pertinent part:

"The language of the Capper-Volstead Act is specific in permitting concerted efforts by farmers in the processing, preparing for market, and marketing of their products. And the legislative history of the Acts reveals several references to the Sunkist organization—then called the California Fruit Growers Exchange and numbering 11,000 members—including a suggestion by Senator Capper that this was a type of cooperative that would find 'definite legalization' under the legislation. * * *

" * * * That the packing is done by local associations, the advertising sales, and traffic by divisions of the area association, and the processing by separate organizations does not in our opinion preclude these growers from being considered one organization or association for purposes of the Clayton and Capper-Volstead Acts." (370 U.S. at 28–29, 82 S.Ct. at 1136).

 With respect to appellant's contention that Sunkist is not a qualified cooperative under Capper-Volstead by reason of its "corporate growers", this

Supreme Court granted certiorari limited to the issue of the immunity of interorganizational dealings among the three cooperatives from the conspiracy provisions of the antitrust law, and held that as a Capper-Volstead cooperative Sunkist was immune and that the case was erroneously submitted to the jury on the theory of a conspiracy under section 1 of the Act. Having held "erroneous one theory of liability upon which the general verdict may have rested * * * it is unnecessary * * * to explore the legality of the other theories". The Court said further that its decision "in no way detracts from earlier cases holding agricultural cooperatives liable for * * * monopolization", citing Maryland & Virginia Milk Producers Ass'n. v. United States, supra. Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. at 20–30, 82 S.Ct. at 1136, 8 L.Ed.2d 305.

18. A stipulation of the parties defining "association" in the Sunkist system re-

cites that the members are classified into three major groups: (1) cooperative associations (80.12% by number and 82.-34% by volume), (2) corporate growers (4.97% by number and 4.72% by volume), and (3) agency associations (14.91% by number and 12.94% by volume). The stipulation reads in part: "The Agency Association is normally a private corporation which owns and operates packing house facilities * * *. Such Agency Associations do not qualify as, nor do they claim to be, cooperative associations under section 1 of the Capper-Volstead Act. * * * The Agency Association does not itself participate in either the gain or loss involved in marketing fruit through Sunkist beyond the recovery of its costs and fixed fee for packing. Such Agency Association furnishes its facilities and services on an independent contract basis, wholly unrelated to the net returns from the sale of the product handled". (Clk.Tr. 1792–4).

question was raised in the district court in United States v. Maryland & Virginia Milk Producers Ass'n, D.D.C.1958, 167 F.Supp. 45, aff'd in part, reversed in part on other grounds, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880. In that case the Government urged that the words "dairymen" and "farmers" should be restricted to natural persons. The district court held that it was immaterial "whether every member of the association is a natural person or a corporation." [19]

The Supreme Court did not comment on this portion of the district court's opinion, although it considered at length the scope of the immunity granted by Capper-Volstead. It is clear from the district court's opinion that the cooperative included corporate growers. It seems likely that this fact would have been considered by the Supreme Court if there were any question regarding the status of the association as a qualified cooperative by reason of the corporate growers.

1 U.S.C. § 1 provides that in "determining the meaning of any Act * * * of Congress, unless the context indicates otherwise * * * the words 'person' and 'whoever' includes corporations * * * as well as individuals * * * ".

We find nothing in the context of the Capper-Volstead Act to indicate that a corporation would not be considered a person within the meaning of the Act.

Does the fact that the so-called agency associations (comprising 14.91% by number and 12.94% by volume) constitute a "class" of membership prevent Sunkist from being a "person engaged in the production of agricultural products" under section 1 of the Act? It will be noted from the stipulation of the parties (note 18) that the agency associations furnish their facilities and services on an independent contract basis, and that they do not participate in either gain or loss involved in marketing fruit through Sunkist. In other words, the growers receive full benefit of cooperative marketing through the agencies.

Associations organized under the Capper-Volstead Act "may make the necessary contracts and agreements to effect" the purposes of the Act, i. e., "collectively processing, preparing for market, handling, and marketing" their products. (7 U.S.C. § 291). The agency associations supply services which the growers require (packing house facilities) in handling and marketing their products. The fact that the "packing is done by local associations * * * and the processing by separate organizations" does not preclude the growers from being considered one association for purposes of the Capper-Volstead Act. Sunkist Growers, Inc. v. Winckler & Smith Co. supra.

This is not a case where the agreement in question goes beyond the legitimate objects of processing and marketing. See e. g. United States v. Borden Co., 1939, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181. The Court there recognized that agricultural producers "may unite in preparing for market and in marketing their products", and may "make the contracts which are necessary for that collaboration", but they are not authorized to conspire with others in restraint of trade. The Court said in part:

"In this instance, the conspiracy charged is not that of merely forming a collective association of producers to market their products but a conspiracy, or conspiracies, with major distributors and their allied groups, with labor officials, municipal officials, and others, in order to maintain artificial and non-competitive prices to be paid to all producers for all fluid milk produced in Illinois * * * and also to

19. The court said further:
"* * * The owner or operator of a dairy is a dairyman, whether he personally works on his dairy or has the work done by employees. So, too, the owner of a farm may be regarded as a farmer even though he devotes the major portion of his activities to other pursuits. * * *." (167 F.Supp. at 49).

control 'the supply of fluid milk permitted to be brought to Chicago'." (308 U.S. at 205, 60 S.Ct. at 191).

In Maryland & Virginia Milk Producers Association v. United States, supra, the court pointed out that the object of the conspiracy or combination was to eliminate a competitor and that the "allegations of the complaint * * * charge *anticompetitive activities which are so far outside the 'legitimate objects' of a cooperative* that, if proved, they would constitute clear violations of § 2 of the Sherman Act * * *." (362 U.S. at 468, 80 S.Ct. at 854, 4 L.Ed.2d 880). (Emphasis added). The Court said further:

"The Embassy assets the Association acquired are useful in processing and marketing milk, and we may assume, as it is contended, that *their purchase simply for business use, without more, often would be permitted and would be lawful under the Capper-Volstead Act.* * * * The contract of purchase here, viewed in the context of all the evidence and findings, *was not one made merely to advance the Association's own permissible processing and marketing business;* it was entered into by both parties, according to the court's findings as we understand them, because of its usefulness as a weapon to restrain and suppress competitors and competition * * *." (362 U.S. at 471–472, 80 S.Ct. at 856). (Emphasis added).

The independent contracts with the agency associations were for the legitimate objects of processing and marketing. Under the statute Sunkist could have entered into these contracts "with separate organizations". The mere fact that the agency associations constitute a "class" of membership does not in our opinion change the effect of the agency agreements or destroy the exempt status of the entire association.

*Request for Leave to File Second Supplemental Complaint*

Appellant next contends that the district court abused its discretion in denying plaintiff's motion to file a second supplemental complaint alleging facts occurring after the filing of the original complaint. In our opinion, upon remand of this case, appellant should be permitted to file the supplemental complaint. As the Court said in Texarkana v. Arkansas, Louisiana Gas Co., 1939, 306 U.S. 188, 59 S.Ct. 448, 83 L.Ed. 598:

"Where there is a good cause of action stated in the original bill, a supplemental bill setting up facts subsequently occurring which justifies other or further relief is proper. If the original decree in the trial court had not been entered, this supplemental petition would simplify the controversy. We think this procedure is equally applicable after remand for further proceedings." (306 U.S. at 203, 59 S.Ct. at 455).

*Alleged Prejudice and Bias of Trial Judge*

Finally appellant contends that the trial judge showed such marked prejudice against appellant that this court should order a new trial before another judge. In our opinion, the record does not support our issuance of the requested order. We are confident that the district court, upon remand and in the proper administration of its own functions, will insure that the retrial is conducted in the necessary atmosphere of total impartiality.

It is ordered that the judgment be reversed and the cause remanded to the district court for a new trial.

ELY, Circuit Judge (dissenting in part):

I agree with the result reached by the majority, and I concur in its opinion except for that portion in which it is held that Sunkist falls within the exemption of section 1 of the Capper-Volstead Act, 7 U.S.C. § 291.

The principal reason offered by the majority in support of the view which I question is its asserted belief that the question was settled in Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 82 S.Ct. 1130, 8 L.

Ed.2d 305 (1962). I do not so interpret that decision. The particular issue was not presented to the Supreme Court, and it was not adjudicated. It was apparently conceded by the parties in *Winckler,* of which the appellant here was not one, that Sunkist was covered by the Capper-Volstead exemption. In the prior opinion of the Court of Appeals, reported at 284 F.2d 1 (9th Cir. 1960), the only discussion of the exemption pertained to its extent, not to whether or not it was applicable. Furthermore, the Supreme Court, in granting certiorari, 368 U.S. 813, 82 S.Ct. 56, 7 L.Ed.2d 22 (1961), expressly limited its consideration to a single question, namely,

> "Where a group of citrus fruit *growers* form a co-operative organization for the purpose of collectively processing and marketing their fruit, and carry out those functions through the agency of three co-operative agricultural associations, each of which is basically *wholly owned and governed by those growers, and each of which is admittedly entitled to the exemption from the antitrust laws accorded to agricultural cooperatives by the Capper-Volstead Act* (7 U.S.C.A., sec. 291)—is an unlawful conspiracy, combination or agreement established under Sections 1 and 2 of the Sherman Act [15 U.S.C.A. §§ 1, 2] upon proof only that these *growers,* through the agency of these three co-operatives, *agreed among only themselves* with respect to the extent of the division of the function of processing between them or with respect to the price they would charge in the open market for the fruit and the by-products thereof processed and marketed by them?" (Emphasis supplied.)

Even if the issue had been determined by the Supreme Court in *Winckler,* the admitted nature of Sunkist's present organizational make-up is such that the exemption should no longer be held properly to apply. The privilege to act together in "exempt" associations is conferred only upon "persons engaged in the production of agricultural products. * * *." 7 U.S.C. § 291. The plain import of the statutory language is that such an association must be composed *solely* of agricultural producers. Regardless of whether Sunkist was thus composed at the time of the *Winckler* decision in 1962, as the Supreme Court's order granting certiorari, supra, indicates, it is clear that the composition is no longer the same. In our case, it is conceded that the so-called "agency associations," which comprise almost 15% of the membership of the Sunkist organization, are *not* growers or producers.[1] The majority, in disregarding the significance of this factor, may have been influenced by the absence of decisions squarely holding that an association must be composed entirely of growers in order to qualify for the exemption. I point out that, while there are no decisions to that effect, there are none to the contrary. The opinions in a number of cases contain language which suggests the conclusion which I see to be plainly required by the statute's terms. Some of this language is as follows:

> "The persons to whom the Capper-Volstead Act applies are defined in § 1 as *producers of agricultural products* * * *. They are authorized to act together 'in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce' their products. * * *

1. In its footnote 18, the majority refers to a portion of a stipulation wherein the parties agreed that the agency associations furnished to Sunkist their "facilities and services on an independent contract basis * * *." The stipulation does *not* say that the associations were independent contractors. It recites that they were *"members"* of the Sunkist system. If the association were truly separate and independent, then that determination should be made, in the first instance, by the District Court. If they were not "members" of the Sunkist system, then, as I see it, the exemption of the Capper-Volstead Act is irrelevant to the issue of the propriety of Sunkist's dealings with them. United States v. Borden Co., supra.

"The right of *these agricultural producers* thus to unite * * * cannot be deemed to authorize any combination or conspiracy *with other persons* in restraint of trade that these producers may see fit to devise." United States v. Borden Co., 308 U.S. 188, 204–205, 60 S.Ct. 182, 84 L.Ed. 181, 191 (1939) (Emphasis supplied.).

"The chief defense set up by the Association was that, because of its being a cooperative composed *exclusively of dairy farmers,* § 6 of the Clayton Act and §§ 1 and 2 of the Capper-Volstead Act completely exempted and immunized it * * *. Accordingly the court dismissed the Sherman Act § 2 monopolization charge, where the Association was not alleged to have acted in combination with others, but upheld the right of the Government to go to trial on the Sherman Act § 3 and Clayton Act § 7 charges *because they involved alleged activities with* the owners of Embassy and other *persons who were not agricultural producers.*" Maryland & Virginia Milk Producers Assn., Inc. v. United States, 362 U.S. 458, 461–462, 80 S.Ct. 847, 851, 4 L.Ed. 2d 880 (1960) (Emphasis supplied.).

"Thus, the full effect of § 6 is that a *group of farmers* acting together * * * cannot be restrained * * *.

"The Capper-Volstead Act * * * extended § 6 of the Clayton Act exemption to capital stock agricultural cooperatives * * *. The general philosophy of both was simply that *individual farmers* should be given * * * the same unified competitive advantage * * * available to businessmen * * *." Id., 362 U.S. at 465–466, 80 S.Ct. at 853 (Emphasis supplied.).

"[O]ur decision in no way detracts from earlier cases holding agricultural cooperatives liable for conspiracies with outside groups, United States v. Borden Co., 308 U.S. 188, [60 S.Ct. 182, 84 L.Ed. 181] * * *." Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305 (1962).

"The Court concludes that a combination between two or more agricultural cooperatives to fix prices of their products is exempt from the antitrust laws *provided that no other person that is not such an organization or a member of such a group is a part of the combination.*" United States v. Maryland Cooperative Milk Pro., 145 F.Supp. 151, 155 (D.D.C.1956) (Emphasis supplied.).

"Although the Capper-Volstead Act * * * and the Clayton Act * * * give *some privileges to combinations* of agricultural *producers, a combination of producers and distributors* to eliminate competition and fix prices at successive stages in the marketing of an agricultural product *is not privileged.*" United States v. Maryland & Virginia Milk Pro. Ass'n, 85 U.S.App. D.C. 180, 179 F.2d 426, 428 (1949) (Emphasis supplied.).

"The exemptions are accorded and immunities are conferred on agricultural cooperatives and their activities. *When they* step outside of their field and *conspire with persons who are not producers of agricultural commodities,* they are *beyond the scope of the exemptions.*" United States v. Maryland & Virginia Milk Pro. Ass'n, 167 F.Supp. 45, 51–52 (D.D.C.1958), modified, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960) (Emphasis supplied.).

The persistent theme of the foregoing excerpts is that a cooperative, even though it otherwise qualifies for exemption under the Capper-Volstead Act, forfeits its exemption when it combines with non-producers. If that is so, then it is logically inconsistent to hold that a cooperative, while composed in part of non-producers, may yet qualify for the exemption.