In re IBM PERIPHERAL EDP DEVICES ANTITRUST LITIGATION.

TRANSAMERICA COMPUTER COMPANY, INC., a corporation, Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION, a corporation, Defendant.

MBL No. 163–RM.
No. C–73–1832 RHS.

United States District Court,
N. D. California.

Oct. 3, 1978.

William W. Vaughn, O'Melveny & Myers, Los Angeles, Cal., for plaintiff.

Richard J. Lucas, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., for defendant.

## ORDER

SCHNACKE, District Judge.

Defendant, contending that the issues involved in this complex antitrust case are beyond the capabilities of an ordinary jury, has moved to strike plaintiff's jury demand. Defendant anticipates that because the trial is expected to be lengthy, it

would be impossible to impanel a fairly representative jury and argues that submission of these issues to a nonrepresentative, incompetent fact-finder would violate due process of law.

This Court recognizes the difficulties that a lengthy, complex jury trial entails, but despite these difficulties, the command of the Seventh Amendment is clear. A jury trial would not be constitutionally inappropriate. Defendant's motion to strike the jury trial demand is denied.

## ON MOTION TO CERTIFY APPEAL

■ In the event that any of its other motions heard on September 22, 1978 are denied, defendant has moved for an order pursuant to 28 U.S.C. § 1292(b) certifying that the motion denied involved a controlling question of law, that there is a substantial ground for difference of opinion, and that an immediate appeal may materially advance the ultimate termination of this litigation. Even if a controlling issue of law were involved in any motion denied today, an appeal at this point would certainly not advance the termination of this litigation. The motion to certify for appeal is denied.

## ON MOTION FOR SUMMARY JUDGMENT—ANTITRUST VIOLATIONS

■ Plaintiff claims that certain actions taken by defendant in connection with the design of two of its products, System 370 Models 115 and 125, were anti-competitive and violated the antitrust laws. Defendant has moved for summary judgment with respect to these actions contending that plaintiff should be foreclosed from asserting their illegality by force of the finding in *Memorex Corporation v. International Business Machines Corporation,* 458 F.Supp. 423 at 442–444 (N.D.Cal., 1978), (hereinafter, *Memorex*), that these design decisions were not anti-competitive, were not predatory, and did not unnecessarily exclude competition. Defendant also argues that inclusion of these allegations at this late stage of the proceedings would severely prejudice its defense.

The finding in *Memorex* that defendant relies on was based upon the failure of the plaintiff there to adduce sufficient evidence to support a contrary finding [*Memorex,* at 444], and plaintiff here, neither party nor privy to that case, should not be bound by another's failure of proof. Since defendant faced similar claims in the recent *Memorex* case, and since discovery has proceeded for some time on these issues, prejudice will not result.

Accordingly, summary judgment is denied.

## ON MOTION FOR SUMMARY JUDGMENT—RELEVANT MARKET

Plaintiff claims that defendant has violated the antitrust laws, specifically Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), by monopolizing and attempting to monopolize three relevant product markets: (1) general purpose electronic digital computer systems; (2) tape drives and controllers plug-compatible with IBM central processing units; and (3) disk drives and controllers plug-compatible with IBM central processing units. Defendant has moved for summary judgment with respect to the latter two markets contending that the substitutability of competing products from the consumer's viewpoint and the ease with which other manufacturers could enter the markets indicate a cross-elasticity of both demand and supply of such a degree that these markets must be determined to be too narrowly drawn as a matter of law. Defendant cites *Telex Corporation v. International Business Machines Corporation,* 510 F.2d 894 (10th Cir. 1975), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244, and *Memorex Corporation v. International Business Machines Corporation,* 458 F.Supp. 423 (N.D.Cal., 1978) in support of that proposition.

■ Relevant market is essentially a question of fact [*Telex Corporation v. International Business Machines Corporation,* 510 F.2d at 915]. Defendant does not contend otherwise. Prior cases are instructive on this factual question, but since plaintiff

was not a party to those actions, they are not binding.

▇ Because resolution of this factual question will require a number of conclusions to be drawn from the evidence, summary judgment would be improper and is hereby denied.

## ON MOTION FOR SUMMARY JUDGMENT—DAMAGES ISSUES

Plaintiff TCC claims that defendant IBM's violations of the antitrust laws (specifically 15 U.S.C. §§ 1 and 2) resulted in: lost revenue on computer equipment owned by TCC at the time of those alleged violations; lost profits on additional investments it would have made between 1972 and 1975 had IBM not violated the law; and the lost benefit of the investment tax credit that TCC would have realized on those planned investments. Defendant IBM has moved for summary judgment on the lost profit claim and on the investment tax credit claim. IBM contends that the lost profits are too speculative and that such damages would be tantamount to awarding prejudgment interest on the lost revenue claim since TCC planned to use revenue to finance the 1972–75 investments. And, IBM predicts that to entertain the lost investment tax credit claim would be to mire this litigation in a maze of collateral issues.

▇ The lost profit claim is not so speculative that the trier of fact should be precluded from judging it on its merits. If, as IBM suggests, the foundation of the lost profit claim, the 1971–75 Profit Plan prepared by TCC management, was based on overly optimistic assumptions, then that factor can be taken into account by those charged with making factual determinations. The law does not require that lost profit claims be calculated with mathematical precision in antitrust cases [see *Zenith Radio Corporation v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); *Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 566 (2d Cir. 1970)].

▇ The fact that the source of some of the funds for the proposed investments was

to be current revenues does not allow the novel characterization of anticipated profits as prejudgment interest. TCC is not asking for a fixed return on the lost revenue; the lost profits it seeks would have resulted from the investment of both capital and labor, and would have rewarded plaintiff's entrepreneurial efforts. Accordingly, the motion for summary judgment on the lost profit claim is denied.

The investment tax credit claim is based on an estimated tax benefit of $6,193,000 TCC allegedly would have realized had it invested as planned. Because of the tax consequences attendant to a damage award TCC (assuming a tax rate of 52%) calculates it requires $12,900,000 to be made whole.

▇ It is with good reason that courts have repeatedly refused to take the tax consequences of damage awards into account. The difficulty involved in recomputation of prior years' taxes and the speculation that would be required [see *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 503, 88 S.Ct. 2224, 2236, 20 L.Ed.2d 1231 (1968); *Paris v. Remington Rand, Inc.,* 101 F.2d 64, 68 (2d Cir. 1939)] would complicate this already complex litigation. Defendant's motion for summary judgment on plaintiff's investment tax credit damages is granted.

## ON MOTION FOR SUMMARY JUDGMENT—PRICING

Plaintiff TCC has designated the pricing of certain products at negative or narrow profit margins and the effect on price of a long term lease known as Fixed Term Plan (hereinafter, FTP) as acts of defendant IBM which violated the antitrust laws (specifically 15 U.S.C. §§ 1 and 2). IBM has moved for summary judgment on these acts claiming that TCC cannot show that its pricing actions were predatory without the utilization of cost adjustments which are impermissible as a matter of law.

The three adjustments which TCC makes to IBM's projected costs for its products which cause IBM the most concern are: (1) changes in the allocation of revenue appor-

tioned costs; (2) the inclusion of opportunity costs; and (3) the inclusion of impact costs.

Revenue apportioned costs are those costs which IBM's accounting procedure allocates to IBM products on the basis of the amount of revenue that product is expected to produce. A set percentage of the total expected revenue is added to the product's other costs in order to account for costs not reflected as direct costs, engineering overhead, or manufacturing overhead. Marketing expenses, personal property taxes on leased equipment, and the expenses of corporate headquarters are examples of costs which are revenue apportioned. The amount of revenue apportioned cost attributed to a product is thus directly proportional to both the number of units sold or leased and to the price of each unit. So, if the price of a unit is reduced, revenue apportioned costs for that unit would be proportionately reduced.

■ TCC feels that this accounting method serves to understate a product's costs in the event of a price cut, allowing IBM to hide behind its accounting procedure when it predatorily prices, and suggests holding the revenue apportioned costs attributed to a product constant when prices are dropped. Whether one method of accounting for costs actually incurred or another is proper is essentially a question of fact, and thus is not a proper subject for summary judgment.

The concept of opportunity costs is a decision making device that economists use to compare alternative courses of conduct. If an investor faces two mutually exclusive alternatives, one which would produce a return of $8 per year on an investment of $100, and another which would produce a return of $6, the opportunity cost that is to be ascribed to choosing the first alternative is the profit foregone on the second or $6. The first alternative would produce a *relative* profit of $2 while the second would produce a *relative* loss of $2.

TCC has taken this concept one step further than the decision making stage and seeks to subtract from the profits IBM predicted it would realize on a particular product the estimated profits that might have been realized on a product that could have been produced in its stead. In this fashion, TCC concludes that IBM priced below cost. But, even aside from the speculative nature of the alternative's profits, the use of the concept of opportunity costs in this fashion must be held improper as a matter of law. Such costs are not reflected in a profit and loss statement, and such a theory would restrict the manufacturer with monopoly power to always choosing that alternative predicted to produce the greatest monetary rewards. It would have to blind itself to the host of factors that influence such a decision and could quite possibly lead to a more socially desirable result. The unquantifiable risks associated with a particular alternative, technological considerations, and all the non-economic influences that affect a manufacturer's social responsibilities would all have to be forgotten. Such was not the intent of the Sherman Act and is not what is meant by predatory pricing.

■ The concept of impact costs is similar. This is the reduction in anticipated future profits on an existing product line caused by the introduction of a new product line. It differs from opportunity costs in that one alternative path, the existing product's manufacture, is already being followed, and in that the alternatives faced are not necessarily mutually exclusive. For example, the introduction of a popular and revolutionary new tape device may give rise to impact costs (reductions in anticipated profits) as the result of the withdrawal from production of an outmoded tape device, and also impact costs that result from customers switching from older but continued tape devices to the newer model. Again TCC would take these costs beyond the planning stage and subtract them from the new product's profits in determining whether the price set was predatory and below cost. Such a rule of law would be a disincentive to research and innovation, and has all the drawbacks that calculation of opportunity costs would impose. Neither opportunity nor impact costs (as defined

here) may be included in determining whether a price is predatory.

The standard by which properly includable costs should be tested in order to determine whether a plaintiff has made a *prima facie* showing of predatory conduct is also in dispute. TCC suggests that prices should be measured by comparison with total costs (fixed plus variable), while IBM champions the use of only variable costs for this purpose. TCC also advances an alternative test that is to be used when barriers to entry into the industry are high: pricing below the profit maximization level. This alternative test will be addressed first.

A manufacturer with monopoly power would, in the absence of a predatory animus, be expected to cease producing additional units at the point where the additional costs it would incur would exceed the additional revenue it would expect to result. The highest price which it could charge for that output without dissuading customers from buying would more than cover the extra costs the manufacturer incurred for producing that last item. (In economic terms this means that the demand curve, at the point where the marginal cost and marginal revenue curves intersect is higher than either. See Areeda and Turner, "Predatory Pricing and Related Practices Under Section 2 of the Sherman Act", 88 Harv.L.Rev. 697, 697–703 (1975), (hereinafter, Areeda and Turner), for an explanation of these concepts.) If production is profitable at that point, that highest price will also more than cover the manufacturer's total costs. (The average cost curve will also be lower than the demand curve.) By charging that highest price that customers will pay for that quantity of output, the manufacturer with monopoly power would be profit maximizing. If it were to charge something less, but still cover its total costs and make a profit, it is not acting rationally, and presumably is acting to exclude competition.

But a manufacturer with market power which, while still making some profit fails to keep prices as high as it could without losing customers, is not engaged in predatory pricing. The notion that a failure to profit maximize could violate the Sherman Act was soundly rejected by Professors Areeda and Turner who point out that not only would such a standard be unmanageable, but as long as the manufacturer is making some profit only less efficient rivals are eliminated or excluded from competition. [Areeda and Turner, *supra* at 704–709].

The profit maximizing test originated in self-contradictory * dicta [*International Air Ind., Inc. v. American Excelsior Co.,* 517 F.2d 714, 724–725 (5th Cir. 1975)] and has been perpetuated in dicta [*Hanson v. Shell Co.,* 541 F.2d 1352, 1358 n. 5 (9th Cir. 1976)]. It will not be perpetuated here. The imposition of such a standard would be unmanageable, preclude a firm with monopoly power from competing on the merits, and harm consumers. It is rejected as a matter of law.

Because it does not appear that TCC, without the consideration of opportunity costs, without the consideration of impact costs, and without the adoption of a profit maximization test, could prove predatory pricing by either the total cost test or the variable cost test, it is not necessary to determine at this time which of those latter two tests would be appropriate here.

Defendant's summary judgment motion on pricing and FTP is granted, and plaintiff is given leave to resubmit its pricing and FTP claims within ten days from the date of this order if it can meet the standards set forth herein.

## ON MOTION TO STRIKE

Defendant IBM moves to strike and preclude evidence on ten of the acts which plaintiff TCC has designated as conduct by which IBM acquired and maintained and attempted to acquire and maintain monopo-

---

* At one point in the cited text the Court seems to equate the term profit maximization with pricing at average variable cost, while later in the same paragraph it sets out those two standards as alternative tests.

ly power in violation of Sections 1 and 2 of the Sherman Act [15 U.S.C. §§ 1 and 2]. Many of the acts in question occurred prior to TCC's entry into the computer field in 1968. In general, IBM maintains that these acts are irrelevant to any damage claim advanced by TCC and that allowing them to be introduced into evidence would only serve to prejudice the jury and waste time. TCC's position is that a monopolist's conduct must be viewed as a whole, that the acts under attack clarify the character of damage related acts, and that they are evidence of the specific intent to monopolize which is material to TCC's attempted monopolization claim.

In 1962, the United States Supreme Court faced a similar problem. The plaintiff in *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) [hereinafter, *Continental Ore*] sought to introduce evidence of acts of conspiracy and monopolization which began in 1933, prior to its entry into the relevant market in 1938. The Court held that the exclusion of that evidence was improper since it was "clearly material to petitioners' charge that there was a conspiracy and monopolization in existence when they came into the industry, and that they were eliminated in furtherance thereof" [370 U.S. at 710, 82 S.Ct. at 1416]. IBM attempts to distinguish this case as one which also involved a conspiracy charge, an element not present here. But the conspiracy was not crucial to the Court's evidentiary ruling; evidence of acts prior to plaintiff's market entry is admissible to show monopolistic intent [see 370 U.S. at 710, n. 15, 82 S.Ct. 1404].

With that background, the acts complained of will be examined individually to determine their admissibility.

(1) TCC alleges that the System 360 was prematurely announced in 1964 in order to prevent competitors from securing firm commitments for their machines. Since TCC has alleged monopolization of the general purpose electronic digital computer systems market, and since this act occurred within the five-year time frame

approved in *Continental Ore,* it is relevant and not too remote. The motion to strike this act and preclude evidence thereon is denied.

(2) TCC alleges that the scientific computers, System 360 Models 44 and 90, and IBM's time-sharing computer, System 360 Model 67, were prematurely announced and intentionally priced below cost. These models were announced in 1964 (Model 90) and 1965 (Models 44 and 67). As with the System 360 announcements, these acts did not occur so far in advance of TCC's entry into the field that their probative value is insignificant, and here the relevancy is heightened by the allegation of predatory pricing. The motion to strike this act and preclude evidence thereon is denied.

(3) TCC alleges that the 1956 settlement agreement, which terminated antitrust litigation involving Sperry-Rand and IBM and resulted in those two companies sharing their technical know-how, restrained trade. This act occurred eleven years prior to the formation of TCC and is thus "too remote to have sufficient probative value to justify burdening the record with it" [*Continental Ore,* 370 U.S. at 710, 82 S.Ct. at 1416]. The motion to strike this act and preclude evidence thereon is granted.

(4) TCC alleges that IBM's severe reduction of purchase price discounts on used computers in 1965 was done to destroy the competition that IBM faced in the leasing of computers. This evidence is not too remote. It is relevant not only as evidence of conduct by which monopoly power was acquired and maintained, but also as evidence of the specific intent with which IBM acted, and may serve to overcome any defense that monopoly power was "thrust upon" the defendant as a result solely of its superior skill, industry, and foresight. The motion to strike this act and preclude evidence thereon is denied.

(5) TCC intends to adduce evidence of IBM's 1966 reduction of purchase prices by 3% and concomitant increase in rental

rates by 3%. It is not clear how this is relevant to TCC's charge that it was IBM's plan to exclude leasing company competition since this action would lower the "multiplier" while elsewhere TCC complains that high multipliers damaged the lessors [see (8) below]. Still, this act occurred in the same general time period as other acts complained of, and if TCC wishes to prove it in order to paint the "whole picture" they may do so [see *Case-Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449, 459 (9th Cir. 1966)]. The motion to strike this act and preclude evidence thereon is denied.

 (6) TCC alleges that IBM changed the plan by which IBM salespersons were compensated in order to encourage them to promote leasing rather than sales. This too is relevant to the "whole picture" of what TCC maintains was an IBM attempt to destroy leasing competition; it is not too remote, and also may be helpful in interpreting the intent that accompanied other acts complained of. The motion to strike this act and preclude evidence thereon is denied.

(7) TCC alleges that IBM tampered with leasing company financing. IBM counters that these allegations are not germane to TCC since TCC was not dependent upon the public securities market or bank credit, but was internally financed. If, as alleged, IBM discredited the leasing companies' image then that discreditation might tarnish their standing in the eyes of potential lessees as well as in the money market, and so affect TCC. Additionally, this evidence bears upon intent and may show that monopoly power was not thrust upon defendant. The motion to strike this act and preclude evidence thereon is denied.

(8) TCC alleges that IBM set the multipliers (the ratio of purchase price to monthly rental rate) on System 360 Models 25 and 85 (in 1968 and 1969) and on System 370 (in 1970) exceedingly high in order to harm leasing companies, and priced Models 25 and 85 below cost. IBM feels that these issues are irrelevant because TCC ceased purchasing IBM mainframe equipment pri-

or to these actions. But TCC claims that IBM monopolized the general purpose systems market and claims damage to its business as a result. These acts are certainly relevant to a claim of monopolization in that market and thus, the motion to strike these acts and preclude evidence thereon is denied.

(9) TCC alleges that during the 1970's IBM withheld interface information which other manufacturers needed to compete in the IBM plug compatible peripherals market. As a lessor of equipment produced by those other manufacturers, TCC's fortunes were intertwined with those of its suppliers, and since TCC has also alleged monopolization and attempted monopolization of the peripherals markets, these acts are clearly relevant to its case. The motion to strike these acts and preclude evidence thereon is denied.